KANSAS CITY, Appellants, v. KANSAS CITY TERMINAL RAILWAY COMPANY, Appellant.—25 S. W. (2d) 1055.

Court en Banc, February 21, 1930.

*John T. Barker* and *J. C. Petherbridge* for Kansas City.

*Cyrus Crane, Samuel W. Sawyer, John H. Lathrop* and *John N. Monteith* for appellant Kansas City Terminal Railway Company.

888

RAGLAND, C. J.—This is a suit in equity, commenced in the Circuit Court of Jackson County, to compel the defendant to con-struct at its own expense a viaduct where its lines of railroad cross Oak Street projected southwardly, in Kansas City. A contractual obligation on the part of defendant to so construct such viaduct is alleged to have arisen under the provisions of an ordinance, passed by Kansas City and accepted by the defendant in the year 1909. A brief statement of the facts relative to the situation as to railroad terminal facilities in Kansas City at the time of the enactment and acceptance of the ordinance will materially aid in determining the nature of the defendant's undertakings thereunder.

Prior to 1909 such exclusively terminal facilities as existed in Kansas City were owned and operated by the Kansas City Belt Railway Company. In addition to various switches, sidings and spurs, it owned two main lines of railroad, occupying a right of way ranging from fifty to seventy-five feet in width and extending through Kansas City from the state line on the west in a generally northeasterly direction to the eastern city limits. On account of

its limited facilities its services consisted for the most part of merely switching cars from one railroad switch or freight yard to another. In the year just mentioned, companies owning trunk lines of railroad entering Kansas City, ten or more in number, organized the defendant corporation for the purpose of building a union passenger station and acquiring and extending and enlarging the terminal facilities then owned by the Kansas City Belt Railway Company. Their plans contemplated, in addition to the acquiring of a site for a union passenger station, the widening of the right of way of the Belt line throughout to 150 feet in order that it might accommodate as many as six main tracks, the building of new lines, and the securing at various points along the lines still more ground for the establishment of sub-freight stations and team-track yards for the handling of freight in less than car-load lots. In order for such plans to be carried out it was necessary that many streets, alleys and public places or parts of them be vacated. In that situation the ordinance heretofore referred to was passed by Kansas City and accepted by the defendant. It was entitled:

"AN ORDINANCE to provide for the vacation of certain streets and alleys in Kansas City, Missouri; relating to the construction and maintenance of certain bridges, viaducts and subways over and under the existing and proposed railroad tracks of the Kansas City Terminal Railway Company, and providing for the payment of damages, if any, to abutting property owners, and prescribing the conditions for the use of said bridges and viaducts; establishing the grades of the railway tracks and of certain streets at points of intersection with the right of way of the Kansas City Terminal Railway Company; granting to the Kansas City Terminal Railway Company, its successors and assigns, certain franchises and rights of way for its railroad tracks and prescribing the number thereof; providing for the assignment and transfer to the Kansas City Terminal Railway Company of the rights, franchises, privileges and immunities heretofore granted to the Kansas City Belt Railway Company by Ordinance No. 22948, approved August 18th, 1882; providing for the construction, maintenance and operation of a Union Passenger Station in Kansas City, Missouri, and providing for the rights and obligations of the Kansas City Terminal Railway Company and Kansas City, Missouri."

The first three sections of the ordinance related to the vacation of parts of public highways, streets, avenues, alleys and public places, 102 in number and particularly described. According to the provisions of these sections the Kansas City Terminal Railway Company agreed that within ninety days after its acceptance of the ordinance it would file with the city clerk the necessary petitions

and the consents in writing of the persons or corporations owning three-fourths of the front feet of the property fronting on the part of the public highways, streets, alleys, avenues and public places proposed to be vacated, as required by the Kansas City charter. And Kansas City agreed that upon the filing of such petitions or consents in writing it would, unless prevented by legal proceedings, pass and cause to be made effective an ordinance or ordinances vacating the said parts of such public highways, streets, etc. Section 40, the concluding section of the ordinance, was as follows:

"This ordinance shall be submitted, as soon as reasonably possible, to the qualified voters of Kansas City for ratification, and if ratified by a majority vote of said qualified voters, voting at an election to be held for that purpose, it shall be accepted in writing by the Kansas City Terminal Railway Company in such form as may be approved by the City Counselor of Kansas City, Missouri, within sixty (60) days after such ratification, and if not so accepted this ordinance and each and every part thereof shall be null and void. After such acceptance, the Kansas City Terminal Railway Company shall, within the time limited in section 1 hereof, to-wit, within ninety (90) days after such acceptance, file or cause to be filed, its petition or petitions and consents for the vacations of streets, alleys and public places as therein provided. The city of Kansas City shall, upon request as in section 2 provided, and within the time therein limited, pass the necessary ordinance or ordinances providing for said vacations as therein provided, unless prevented by legal proceedings, and on such vacations as Kansas City may not be prevented by legal proceedings from making being duly had and made effective, this ordinance shall become a binding contract between the parties after that date. If the city of Kansas City shall fail or refuse to pass the necessary ordinance or ordinances for the vacation as provided in section 2 hereof, within the time therein limited, this ordinance and each and every part thereof shall be null and void and shall impose no duty or obligation on the Kansas City Terminal Railway Company."

The parts of the streets and alleys so to be vacated were so situated with reference to lands which had been or were to be acquired by the Kansas City Terminal Railway Company that the fee in them upon vacation would revert to it. In other sections of the ordinance the city obligated itself to convey to the defendant railway company other lands in fee and to grant it the right to build its railroad into, through and over a certain park property, and to convey to its said park property in fee, if and when certain inhibitions in the city charter then in force could be obviated. Under still other sections Kansas City gave its assent, and granted the right, to the defendant, for the full term of two hundred years

next ensuing after the date when the ordinance became effective, for the construction, reconstruction, operation and maintenance of its main tracks of railroad, together with such switches, side tracks, team-tracks, connections, switch stands, signals, signal wires, pipes for gas, air, oil and water, conduits, telegraph and telephone poles and wires, as might be necessary or desirable over and across the streets, alleys and public places of Kansas City, as they then existed, or might thereafter exist, or be established or widened.

The defendant railway company on the other hand agreed: to purchase or acquire certain specifically described parcels or strips of land and dedicate them to Kansas City for public highways; to purchase and convey to Kansas City for park purposes a tract of ground immediately south of the site of the union passenger station, upon the condition that Kansas City would at its own expense grade and improve the same; and to construct at certain designated points where its lines of railroad crossed public streets viaducts (at some points subways) of specified materials and in accordance with plans and specifications to be approved by the Board of Public Works, or the Board of Park Commissioners if construction was to be on park property.

Immediately following the sections of the ordinance dealing with the construction of viaducts and subways at designated crossings is found Section 8, the section on which this proceeding is based. It is as follows:

"Section 8. (a) If in addition to those specifically provided for elsewhere in this ordinance, viaducts or subways and approaches thereto or other rights such as appertain to the use of streets, are reasonably required in the future across any line of railroad now owned or which may be hereafter owned by the Kansas City Terminal Railway Company, at any time during the life of this franchise the Kansas City Terminal Railway Company covenants and agrees to grant and does hereby grant and convey without expense to Kansas City rights of way therefor, and rights of way so granted shall be held by Kansas City as and for public streets.

"The Kansas City Terminal Railway Company further covenants and agrees that whenever any such viaduct or subway is reasonably necessary to provide for public traffic, and upon the passage of a reasonable ordinance by Kansas City fixing the time when the same shall be constructed and the place where the same shall be located, the Kansas City Terminal Railway Company will construct and thereafter maintain a subway and approaches (or a viaduct and approaches where a subway is impracticable), such construction and maintenance to be of like character and under like supervision with the construction and maintenance provided for the viaducts and subways mentioned in sections 6 and 7 of this ordi-

nance; provided that the provisions in this paragraph (a) for the construction and maintenance of said future viaducts or subways, approaches and land damages, shall not impose an obligation upon the Kansas City Terminal Railway Company until after the lapse of ten years from the date when the vacations are made; provided further that if during said period of ten years the said Kansas City Terminal Railway Company shall have constructed at the point where such viaduct or subway shall be declared by ordinance to be necessary the six main tracks provided for in paragraph (a) of section 5, or the tracks to be constructed under paragraph (c) of section 5, or the tracks provided for in paragraph (e) of section 5, then the obligation to construct such viaduct or subway and approaches, if reasonably necessary, shall immediately accrue.

"In the event that the Kansas City Terminal Railway Company shall fail, neglect or refuse to construct such a subway and approaches or viaduct and approaches whenever required to do so by the passage of such an ordinance as is provided for in this paragraph, Kansas City may, if it so elects, construct such subway and approaches or viaducts and approaches, paving all the cost and expense thereof, including all necessary land damages, and the Kansas City Terminal Railway Company agrees that it will repay to Kansas City the amount so expended: provided that if in any proceeding to recover the cost of a subway and approaches or viaduct and approaches so constructed by Kansas City the court shall hold that such crossing was not reasonably necessary to provide for public traffic at the time of the construction of said subway or viaduct, then the Kansas City Terminal Railway Company shall not be required at that time to pay the cost thereof, but a decision of any court of competent jurisdiction to that effect shall not prevent Kansas City from subsequently commencing an action for the recovery of the value of said subway and approaches or viaduct and approaches, if such crossing shall become reasonably necessary at some subsequent time, and if at such subsequent time it shall be found that such crossing is reasonably necessary, then the Kansas City Terminal Railway Company shall pay to Kansas City the reasonable value of said subway or viaduct at the time it becomes reasonably necessary and the cost of all future maintenance thereof, and in estimating the reasonable value, the court shall take into consideration the original cost, including all land damages, as well as the depreciation thereof since construction. The remedy provided for by this paragraph (a) shall be in addition to the other remedies provided for by this ordinance and by law.

"(b) So long as the Kansas City Terminal Railway Company shall comply with the provisions of this ordinance respecting the construction and maintenance of subways and viaducts and their

approaches, and in consideration therefor, Kansas City agrees that no crossings at grade, except those now in existence, shall be constructed at any time during the life of this franchise over or across the main tracks of the Kansas City Terminal Railway Company, whose construction is authorized by this ordinance."

There being no suggestion to the contrary, it will be assumed that all the conditions named in Section 40 of the ordinance, as precedent to the ordinance becoming a "binding contract," were duly performed. The ordinance seems to be known in local history as "Union Station Ordinance," and it will be so designated in further reference to it.

In 1921, Kansas City entered upon the execution of a plan previously conceived of establishing a through north-and-south traffic way, one which would permit traffic to pass uninterruptedly from the Jefferson Highway where it comes into the city over the Armour-Burlington-Swift bridge, spanning the Missouri River at the north limits of Kansas City, to the south city limits, and one which would connect with all east-and-west traffic ways, including the 6th Street Traffic Way leading over the Inter-City Viaduct into Kansas City, Kansas. The specific route adopted in accordance with the plan would also afford the most direct communication between the business district of Kansas City and the heavily populated portions of its resident sections. Along the route so marked out was Oak Street, a street fifty-six feet in width extending from 8th Street on the north to 20th Street on the south. (These latter are east-and-west streets.) Pursuant to its said plan Kansas City passed an ordinance on December 12, 1921, widening Oak Street to the extent of fourteen feet on each side. [See Kansas City v. McTernan, 308 Mo. 494, 273 S. W. 105.] That street if extended south from 20th Street would (then as now) connect with a thoroughfare known as Gillham Road. Such extension, however, would cross the right of way and tracks of the defendant. These tracks at that point occupy low ground through which a creek formerly ran as an open stream. Immediately south of defendant's tracks a bluff rises abruptly to an elevation of nearly forty feet: north of the main tracks are team-tracks which spread out fanlike from the north side as far as 20th Street. The width of the strip of ground taken up for right of way proper and freight yard, lying between 20th Street and the bluff, is approximately 600 feet. This strip, owing to the contour of the ground and its occupancy by the railroad, can be crossed by a street only by means of a viaduct, and in order to obtain a suitable grade for a traffic way such viaduct must begin at or near 19th Street, a block still further north. Accordingly on the same day on which the Oak Street widening ordinance was passed, Kansas City in the further prosecution of its said plan enacted an ordinance, which we shall call the Viaduct Ordinance,

"to open, widen, alter and establish Locust Street from Gillham Road (near Twenty-fifth Street) to Twenty-seventh Street, condemning the necessary land therefor, providing for and authorizing the construction of a viaduct with an approach thereto, in Oak Street, produced from the north, over the tracks, right of way and lands of the Kansas City Terminal Railway Company, condemning the necessary easement and right of way for said viaduct, providing for the cost of said improvement, and authorizing the issuing of condemnation fund certificates."

By way of preamble the ordinance recited:

"Whereas, owing to the rapid growth and development of Kansas City, the advent and increasing use of motor cars and trucks, the north-and-south public traffic of the city has become badly congested, and is constantly increasing over the existing streets and viaducts crossing the tracks and right of way of the Kansas City Terminal Railway Company, leading to and from the business centers and the resident districts of the city; and

"Whereas, in order to provide for and relieve such constantly increasing congested traffic, it is necessary and it is the purpose of Kansas City, to construct a great north-and-south traffic way from the Armour-Swift-Burlington Bridge over the Missouri River, at the north side of the city, through the business sections thereof to the southern part of the city, over and along what is known as the Locust Street Connection (a public highway) connecting with Admiral Boulevard; thence south from Admiral Boulevard over and along Oak Street to 20th Street; thence south along Oak Street, produced from the north, over and across the tracks, right of way and lands of the Kansas City Terminal Company to Gillham Road. . . . In order to reach the south side of the tracks, right of way and lands of the Kansas City Terminal Railway Company, it will be necessary to span such tracks, right of way and lands with a viaduct and an approach thereto, in Oak Street and Oak Street produced, from the south line of 19th Street to Gillham Road on the south; . . ."

Section 6 of the ordinance, after setting forth Kansas City's construction of the Union Station Ordinance (therein referred to as the "franchise ordinance"), proceeded as follows:

"And the Common Council finds and declares that the vacations to be made by the city of certain streets and public places mentioned in section 8 of said franchise ordinance, as a condition precedent to the right and authority of the city to require the Kansas City Terminal Railway Company to construct additional viaducts, have been made, as in said franchise provided, all conditions precedent to the right of the city to exercise such authority have been fully complied with on the part of the city; that said viaduct

is reasonably necessary for public traffic, and is of the greatest importance for the growth, convenience, safety and welfare of the city and its inhabitants, and that the obligation on the part of the Kansas City Terminal Railway Company, to construct said viaduct, has accrued and now exists.

"The Common Council further finds and declares that independent of any franchise obligation of the Kansas City Terminal Railway Company to construct and maintain additional viaducts, the present existing viaducts over the tracks and right of way of the Kansas City Terminal Railway Company, are insufficient to adequately accommodate the public traffic using the same; that the north-and-south public traffic in the city over the present viaducts spanning the tracks and right of way of the Kansas City Terminal Railway Company is greatly congested, and is constantly increasing; and that a viaduct with an approach thereto in Oak Street and Oak Street produced south, over and across the tracks, right of way and lands of the Kansas City Terminal Railway Company is badly and imperatively needed and is reasonably necessary for the north-and-south public traffic passing through, to and from the business centers of the city, in order to relieve the constantly increasing congested vehicular public traffic over other viaducts and traffic ways, running north and south through the city, and is necessary and essential for the safety and security of the traveling public traffic passing over and along such north and south routes to and from the business centers of the city."

The ordinance, after providing for the widening and altering of certain streets and the taking of the necessary lands therefor, required the Terminal Company to "construct a viaduct and its approach to be used as and for a public highway in Oak Street and Oak Street produced south, over and across its tracks, right of way and lands and to the south line thereof, beginning in Oak Street at the south line of 19th Street, and extending south in Oak Street and Oak Street produced to the south line of its lands and right of way in Kansas City," all in accordance with the plans and specifications on file with the Board of Public Works of Kansas City. It also provided that an easement for the construction, support and maintenance of the viaduct and its approach, in all of the lands within the site of the proposed improvement, and in those immediately abutting thereon, be taken and condemned.

Following the passage of the viaduct ordinance, Kansas City applied to the Public Service Commission for an order approving the manner of crossing the defendant's railroad tracks by Oak Street, including the particular point of crossing, and compelling the defendant to construct the viaduct at its own expense—all as provided for in the ordinance. At the conclusion of the hearing had before the Commission, Kansas City, in order to meet certain

criticisms and objections on the part of the defendant to the plans and specifications prescribed by the ordinance for the construction of the viaduct, offered a modified plan which the Commission approved. The Commission thereupon entered its order approving the manner of crossing (as embodied in the modified plan), including the particular point of crossing. It also ordered the defendant Railway Company to construct the viaduct at its own expense. The first order was affirmed by this court; the second was set aside. [State ex rel. Terminal Railway Company v. Public Service Commission, 308 Mo. 359, 378, et seq., 272 S. W. 957.]

Following the action of the Public Service Commission just referred to an ordinance was passed amending the Viaduct Ordinance in respect to its provision prescribing plans and specifications for the construction of the viaduct, making them conform to the "modified plan," that plan having had the previous approval of the Board of Public Works.

The defendant having refused compliance with the Viaduct Ordinance, this suit was instituted. The petition after setting forth by way of inducement many matters of an historical nature, some of which have been referred to in the preceding portions of this statement, alleged that the Union Station Ordinance constituted a valid and binding contract between plaintiff and defendant; that under Section 8 of said ordinance the defendant specifically agreed and bound itself "to construct and maintain such additional viaducts and approaches thereto, at its expense, across its tracks as the future development of the city might demand, 'whenever reasonably necessary to provide for public traffic, upon the passage of a reasonable ordinance fixing the time when the same shall be constructed and the place where the same shall be located,' and agreed to give and grant to the city a right of way therefor, across the tracks for that purpose, as and for a public street;" that a viaduct on Oak Street produced from the north to Gillham Road, where it crosses the tracks and right of way of the defendant, is reasonably necessary for public traffic; that Kansas City has passed a reasonable ordinance fixing the time when the same shall be constructed and the place where the same shall be located, and has fully conformed and complied with all other conditions precedent under said Section 8 of the accrual of the city's right to have said viaduct built by defendant at its expense; and that the manner of crossing as prescribed by the ordinance requiring the construction of such viaduct, including the particular point of crossing, has been duly approved by the Public Service Commission.

The petition concluded: "Wherefore, plaintiff prays for a decree of this court against the defendant enforcing specific performance of Section 8 of defendant's franchise contract by ordering, direct-

ing and decreeing the defendant, Kansas City Terminal Railway Company, to construct and maintain in Oak Street and Oak Street extended south over and across its tracks and right of way, a viaduct with necessary approaches thereto, according to the general plan thereof, described and set forth in paragraph 8 (setting forth Section 7, as amended, of the Viaduct Ordinance) of this petition and attached hereto as exhibit 'C'; that the work thereof be begun within thirty days after the court proceedings, provided for in said ordinance No. 41448 (the Viaduct Ordinance) to ascertain the damages and benefits for the widening of Locust Street and the damages and benefits, if any, to abutting property, on account of the construction of the approaches to said viaduct in Oak Street, in front of and adjacent to such property, have been determined, and to complete such viaduct and its approaches within two years thereafter, barring unavoidable delays, the Act of God, strikes, the public enemy or interference by court proceedings, which time so lost to be added to the time for the completion of said structure, all in compliance with Section 8 of said franchise contract, and in accordance with Ordinance No. 41448, as amended by Ordinance No. 45970, for cost of construction and all such other and further relief to which plaintiff is entitled in the premises.''

The answer was voluminous. With respect to it, it seems necessary only to say that it is entirely sufficient to raise all of the questions which are advanced by defendant on this appeal. Such of those questions as defendant characterizes as its ''chief contentions'' are summarized by it as follows:

''First, that Section 8 of the Union Station Ordinance relied upon by plaintiff is regulatory, not contractual in its nature, but that, in either case, it has been abrogated by the Public Service Commission Act which gave to the Public Service Commission exclusive jurisdicton over the entire subject-matter;

''Second, even if Section 8 is contractual, plaintiff's interpretation of it is erroneous. It applies only to crossings of the company's main line right of way and not to a crossing of the McGee Street team-track yard and freight house;

''Third, even, if Section 8 were contractual and even if it could apply to the crossing of the team-track yard and freight house at Oak Street, it is not automatically operative. It can become operative only upon the performance by Kansas City of the conditions precedent—the chief of which is the passage of a *reasonable ordinance* requiring the viaduct and fixing the time, place, etc. This condition precedent has become impossible by operation of law, because the power to enact an ordinance on the subject-matter has been taken away from the city and conferred upon the Public Service Commission. The city, by invoking the jurisdiction of the Public Service Commission to fix the time and place and by secur-

ing from the Supreme Court a modification of the original mandate of the Supreme Court by which that part of the order which did fix the time and place of crossing were permitted to remain in force, has conceded that it could not validly pass such an ordinance.

"In any event, the Terminal Company did not contract to construct a crossing at the time and in the manner and at the place fixed by the Public Service Commission and the court cannot make for the parties a contract to this effect which the parties did not make;

"Fourth, the plaintiff, even if it had the power to pass an ordinance and the ordinance were otherwise valid, has not enacted a *reasonable ordinance.*

"Plaintiff assumes that the question is merely one of public necessity to be determined by the city council as in the opening of streets, and without review by the courts except in case of fraud or gross abuse of power.

"The defendant's contention is that the passage of a reasonable ordinance is a condition precedent by the express language of the contract and is expressly made a judicial question, in the determination of which the plaintiff is entitled to no presumptions whatever, but that the plaintiff, like any other litigant, must itself establish compliance with the conditions precedent, and that the burden of proof is therefore upon the plaintiff. Defendant's position also is that the question of the reasonableness of the ordinance raises every consideration bearing upon it, such as the benefit or damage to the railroad company and their relation to the burden proposed to be put upon the railroad company; the relation of the need, if any, to the expense; the fundamental occasion for the viaduct—whether the obstacles of nature or the construction of the railroad; whether the purpose is to care for existing traffic on the street or to create a new artery of traffic; whether the viaducts already in existence are not adequate to take care of the traffic; whether the city has itself exerted all of the means within its power to utilize to the full extent the viaduct facilities already provided by the defendant, such as proper regulation of the traffic, the widening of roadways and the construction of new roadways to utilize existing viaducts; the amount of expenditures which the Terminal Company has already made for the benefit of the city; the relatively complete provision made for traffic by way of viaducts and subways in Kansas City at the expense of the defendant as compared with other cities of larger size and greater traffic, such as Chicago and St. Louis; the extent, if any, to which the improvement is for the benefit of property owners on the newly created artery and various other questions which appear in the record;

"Fifth, that Section 8, if it is contractual at all, is a part of the provision relating to viaducts and that plaintiff has breached the agreement on its part (which was the consideration for the defendant's agreement) by failing to impose upon the Kansas City Railways Company and the Kansas City Public Service Company in their respective franchises one-half of the cost of viaducts and subways and their maintenance, as it agreed to do;

"Sixth, that the imposition of the expenditure upon the defendant would conflict with the Transportation Act and impose a burden upon interstate commerce, in violation of the commerce clause of the United States Constitution;

"Seventh, that Ordinance No. 41448 does not comply with Section 8 of the Union Station Ordinance;

"Eighth, that Section 8 of Ordinance No. 2336 (Union Station Ordinance) and Ordinance No. 41448 violate both the Federal and the State constitutions;

"Ninth, that a viaduct at Oak Street is not necessary;

"Tenth, that specific performance is not an appropriate remedy."

After hearing the evidence the circuit court decreed:

"(1) That the order of the Public Service Commission of Missouri, in so far as such order determines and prescribes the manner, including the particular point of the crossing, of a viaduct (known as the Oak Street Viaduct) and approaches thereto over the tracks of the Kansas City Terminal Railway Company, cannot be enforced in this proceeding, and, in so far as the petition seeks a decree for the enforcement of that order, it is dismissed for want of jurisdiction.

". . . (2) that the defendant, Kansas City Terminal Railway Company, shall pay the entire cost of constructing said viaduct and the necessary approaches thereto if and when constructed by it under and in pursuance of the said order of the Public Service Commission, whether done voluntarily or under the order of a court."

From such decree both parties appealed. The facts will be further developed, where necessary, in connection with the questions considered.

I. 1. Is Section 8 of the ordinance merely regulatory or is it contractual in its nature? The ordinance as a whole must be looked to. It is manifest that it was enacted for the purpose of enabling the Terminal Railway Company to secure suitable and sufficient grounds: for the erection of a union passenger station; for increasing and extending its main lines of railroad; and for the establishment of sub-freight stations and team-track yards—all to the end that

it would be enabled to furnish adequate terminal facilities for the trunk lines of railroad entering Kansas City. In general outline the ordinance provided that Kansas City should convey certain parcels of ground in fee to' the Terminal Railway Company, vacate designated streets and alleys, and grant to the Terminal Railway Company the right to cross with its railroad the streets and alleys of Kansas City, then existing or thereafter established, for a full period of two hundred years; and that the Terminal Railway Company should acquire and convey to Kansas City for use as streets and alleys certain parcels of land, construct viaducts at designated crossings of the streets by its railroad and thereafter construct viaducts over other crossings whenever reasonably necessary to provide for the public traffic, upon the passage of a reasonable ordinance fixing the time when and the place where any such viaduct should be constructed. Other provisions of the ordinance were largely incidental or collateral.

It was recognized that Kansas City could not irrevocably bind itself to vacate the designated streets and alleys, but these vacations were deemed so essential to the main purpose of the ordinance that a provision for its nullification, in the event the vacations were not made, was inserted. It was provided on the other hand that upon the vacations being made as stipulated "this ordinance shall become a binding contract between the parties after that date."

The ordinance as a whole is not only in form a contract, but it expressly declares on its face that it is a contract. Section 8 sets forth one of the Terminal Railway Company's principal undertakings; therein it "covenants and agrees" that it will in the future construct viaducts whenever reasonably necessary for the public traffic, etc.; no sound reason has been advanced why the section should not be held to be "contractual in its nature;" it was plainly so intended by the parties.

Defendant argues that Section 8 is essentially a police regulation imposed by the city, or a reservation of the city's police power assented to by the Terminal Company; that at the time of the passage of the ordinance it was doubtful "under the decisions of this court whether the city had power to impose upon a railroad company any part of the cost of a crossing by a railroad of a street laid out after the construction of the railroad;" and that under this condition of uncertainty it was natural that the city should be anxious to secure an acknowledgment by the grantee under the ordinance that the city had in fact all the powers which the charter purported to grant—especially that its powers applied to future as well as to existing streets. Of what avail it would have been to Kansas City to reserve a non-existent power, or to secure an acknowledgment on the part of the Terminal Railway Company

of the actuality of a fictitious power, is left dark. If such uncertainty did exist, it is more probable that Kansas City was unwilling to leave the matter of the future construction of viaducts to the compulsion of the police power, and therefore obligated the Railway Company by contract to make such construction at its own expense.

2. Was Section 8, as a constituent part of the ordinance contract, abrogated by the Public Service Commission Law enacted in the year 1913? It is claimed that Section 50 of that Act  (now Sec. 10459, R. S. 1919, amended in 1925, Laws 1925, p. 322) effected such nullification. Said section consists of two subdivisions. The first provides: "No public road, highway or street shall hereafter be constructed across the tracks of any railroad corporation at grade, nor shall the tracks of any railroad corporation be constructed across a public road, highway or street at grade . . . without having first secured the permission of the Commission." The second: "The Commission shall have the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, use and protection of each crossing . . . of a public road or highway by a railroad . . ."

The Public Service Commission Law, including said Section 50, was enacted in the exercise of the police power. Under that power it is competent for the State to regulate the construction and use of the crossings of highways and streets by railroads, and to require railroad companies to pay a portion or all of the expense of constructing such crossings, whether constructed before or after the building of the railroads. [State ex rel. v. Public Service Commission, 271 Mo. 270, 197 S. W. 56; Northern Pacific Railway v. Duluth, 208 U. S. 583.]

Section 5, Article XII, of the Constitution, provides:

"The exercise of the police power of the State shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the State."

This section is merely declarative of a fundamental principle of government. [State v. Railroad, 242 Mo. 339, 147 S. W. 118.] The exercise of the police power cannot be limited, abridged or hampered in any manner, whether by statute, ordinance or contract. [State v. Public Service Commission, 275 Mo. 201, 204 S. W. 497; Northern Pacific Railway v. Duluth, supra; Chicago, etc. Railroad v. Nebraska, 170 U. S. 57.]

The precise question here involved is whether the ordinance contract, and particularly Section 8, does in fact limit, abridge or

hamper the exercise of the police power of the State. [M. K. & T. Railroad Co. v. Oklahoma, 271 U. S. 303.]

At the time of the passage of the Union Station Ordinance, Kansas City was invested with the police power heretofore referred to, in respect to the crossings of its streets and alleys by railroads. [American Tobacco Co. v. St. Louis, 247 Mo. 374, 202 S. W. 1117.] Wherein did Kansas City renounce any of that power in the enactment of the ordinance? In what respect did the ordinance limit the exercise of the power? A careful scrutiny of the ordinance as a whole leads us to conclude that the answers to these questions must be that Kansas City, did not divest itself of any. of its power to provide for, regulate and control the crossings of its streets by the railroad, nor did the ordinance in any way limit the exercise of its power in that regard. That it did not intend to part with any of its power as to such crossings is made plain by Section 22 of the ordinance, wherein it is expressly stipulated that nothing in the ordinance should be construed to take away from the city any right or power as to the regulation and control of the Terminal Railway Company, whether conferred by charter or law, but that all such rights and powers should continue as they existed at the time the ordinance should become effective.

According to Section 8 and provisions of Sections 6 and 7 incorporated in it: the Terminal Railway Company can be required to construct a viaduct "whenever reasonably necessary to provide for public traffic, and upon the passage of a reasonable ordinance," fixing the time when and the place where the same is to be constructed; such viaduct must be suitable and safe for ordinary traffic; and it must be constructed in accordance with plans approved by the Board of Public Works. The only thing, apparently, that was withdrawn from the future discretion of the city's authorities was the character of the materials to be used in the construction of the sub-structure and the super-structure: they are required to be of stone, concrete and steel. But the ordinance did not provide that *all* crossings of streets by the railroad should be by means of viaducts or subways constructed in accordance with the provisions of Section 8. If the city had at any time concluded that a wooden viaduct was more suitable for a given crossing than one of stone, concrete and steel, it was at liberty to ignore the ordinance and proceed under the general police power.

The requirement that the entire expense of viaducts constructed in accordance with the provisions of Section 8 should be borne by the railroad company was not a surrender of police power relating thereto, but an exercise of that power to the fullest extent.

So far as we have been able to find, the only limitations on the city's powers as they then existed occurs in Subdiv. (b) of Section

8. The city there agreed that it would not require any crossings at grade. In view, however, of the universally recognized dangers attendant upon the use of such crossings (See Subdiv. 1, Section 50, supra) this provision cannot be regarded as a limitation of the police power. In any event it is not material to this controversy.

Since the Legislature in 1913 withdrew from Kansas City a portion of the police power relating to the crossings of streets by railroads and vested it in the Public Service Commission, the immediate question is whether the ordinance contract under consideration operates to limit the exercise by the Commission of the powers so transferred to it. Preliminary to the consideration of that question the specific powers left undisturbed in the city, as well as those withdrawn and delegated to the Commission, should be noted.

"There is nothing in the Public Service Commission Law to which our attention has been called, certainly nothing in Section 50 thereof cited by counsel, that warrants the conclusion that the Commission is in any sense invested with the power of eminent domain, or with authority to direct or control cities and other municipalities in the exercise of that power in establishing and opening streets. Questions relating to the necessity, expediency or propriety of establishing and extending streets and highways, *even when they cross railroads,* are not matters for its consideration." [City of Kirksville v. Hines, 285 Mo. 233, 240, 225 S. W. 950.]

"Let it be granted, therefore, that the manner in which a street or road crossing is to be installed, used and maintained has been delegated to the Public Service Commission, the right in the first instance to grant or refuse this privilege has been reserved to the municipal authorities. That this division of the police power has been wisely determined no one familiar with the organization of cities and counties and the consequent importance, if not the necessity, of investing them with the right to control their highways, will deny." [State ex rel. Kansas City v. Public Service Commission, 301 Mo. 179, 195, 257 S. W. 462.]

"The Commission has the exclusive right to determine and prescribe both (a) the manner of crossing and (b) the apportionment of expenses." [State ex rel. Terminal Ry. Co. v. Public Service Commission, 308 Mo. 359, 378, 272 S. W. 957.]

The first specific power given the Commission is one to determine the manner of crossing. It is not necessary to the exercise of this power that the Commission itself initiate in a given case the plan of crossing. Plans may be submitted in the first instance by both the railroad and the municipality or by either. The final approval by the Commission of a plan so proposed is the unrestrained exercise by it of "the exclusive power to determine the manner of crossing." That was the precise way in which the power was exercised in the

906

instant case: the Commission approved the plan proposed by Kansas City. But defendant avers it did not agree to build a viaduct in the manner fixed by the Public Service Commission. If the construction demanded is in accordance with the terms of Section 8, the fact that such construction has the approval of the Commission affords defendant no just ground of complaint. As a matter of fact the plan finally adopted by the city after the hearings before the Commission, and which the Commission approved, was somewhat less onerous in its requirements of defendant than the one the city originally proposed.

The Commission has the power to apportion the expense of a crossing. This provision is in recognition of the police power through which the State can, if it so elects, compel a railroad, under ordinary circumstances, to bear all the expense of a crossing. As the jurisdiction of the Commission does not extend to the State or its municipalities, but is limited to the supervision and control of public utilities, the power given it to apportion the expense of a crossing between a railroad and a municipality, is merely the power to fix the amount the railroad shall pay, whether a part or all. If a contract between a municipality and a railroad requires the latter to bear all the expense of a crossing, the contract is not in that respect a limitation of the police power: by its exercise the railroad could not be coerced into paying more.

It has been suggested, however, that, as the Public Service Commission has the power to regulate the rates and charges which a railroad may exact for the transportation of passengers or property  from one point to another within this State and as all expenditures of a railroad company must necessarily be reflected in its rates, the Commission has the power to limit its expenditures for crossings, regardless of its contracts in that respect. Whether the Commission has such power generally speaking we need not determine. Whether it has with respect to the crossings contemplated by the ordinance contract involved in this case is the pertinent question. Kansas City parted with the use of many of its streets and in addition gave to the Terminal Railway Company the irrevocable right to construct and maintain for a long period of years a railroad across all other streets lying across the proposed route of the railroad, on the strength of the latter's promise to construct at its own expense crossings at the points where its railroad crossed the streets, whenever public necessity required. It was through and by means of such promise that the Terminal Railway Company acquired a substantial part of its system of railroad—its plant. The costs when incurred in constructing crossings pursuant to such contractual obligation must be regarded as original capital investments. Now the Public Service

Commission Law of Missouri does not limit, either as to extent or value, the property a railroad company may devote to the purposes of its business of transporting passengers or freight. The Commission can require the utility to furnish facilities which are safe and adequate for rendering the service which it professes to render: its power in that respect extends no further. The property which a utility may use in its business cannot be limited in advance to conform to some supposed standard of reasonable charges for service: on the contrary the rates are based on the value of the property employed. As the Terminal Railway Company's undertaking to build the crossings at its own expense represents in part the original cost of its railroad property, it cannot be relieved to any extent of such obligation by the Public Service Commission.

There is another sound reason why the Public Service Commission is without power to apportion to the Terminal Railway Company any less than the whole of the expense of constructing the crossings covered by the ordinance contract. Kansas City had the absolute and unqualified power to either grant or withhold the right to construct and maintain a railroad across its streets. If it granted the right large outlays would be required for the construction of crossings. From the provisions of the ordinance as a whole it abundantly appears that Kansas City did grant the right in consideration of the express promise of the Terminal Railway Company to construct and maintain the necessary crossings at its own expense. The city having fully performed the contract on its part had, and has, a vested right to performance on the part of the Company. Such vested right was not destroyed by the subsequent enactment of a police regulation of the character of the one involved. [Sec. 15, Art. 2, Mo. Const.; State ex rel. v. Railroad, 262 Mo. 720, l. c. 729, 174 S. W. 73; M. K. & T. Railroad Co. v. Oklahoma, supra; Louisiana Comms. v. Morgan's Co., 264 U. S. 293; Railway Co. v. Decatur, 262 U. S. 432.]

Defendant's industrious counsel have cited many cases in which contracts between municipalities and public utilities, in ordinance form and otherwise, have been held invalid on the ground that they limited the exercise of the police power. But they have found no case holding that, where a railroad company for a valuable consideration moving to it from a municipality has promised to construct crossings at the points where its railroad crosses the streets of the municipality, such contract is an abridgment of the police power. Such a case, and that is the case at bar, is the exact converse of the one considered by the Supreme Court of the United States in M. K. & T. Railroad Co. v. Oklahoma, supra. There the municipality had received an adequate consideration for its agreement to relieve the railroad company entirely of the burden of constructing a cross-

ing. The court held that the contract not only was not a restraint on the police power, but that it was within the protection of the provision of the Constitution of the United States, which forbids the impairment of the obligation of a contract by a state. Contracts with reference to the construction of crossings have been held void primarily on the ground that they were without consideration. Such was the Moberly case. [State ex rel. v. Public Service Commission, 271 Mo. 270.] The City of Moberly and the Wabash Railway Company entered into a contract in 1887, wherein the parties agreed that there should be a separation of grades at a crossing known as the Rollins Street Crossing, that the city and the company should each pay one-half of the cost of constructing a crossing, and that each should pay one-half of the cost of renewal when required. Thirty years later when conditions made a new and larger viaduct necessary, the company insisted that by reason of the contract it could not be required to pay exceeding one-half of the expense. On the application of the city, the Public Service Commission, ignoring the contract, apportioned to the company a much larger share of the expense. This court, in reviewing the Public Service Commission's order, held in effect that the contract in so far as the city was concerned was without consideration, that the State in the exercise of the police power could compel the company to bear all or any part of the expense of reconstructing the crossing, and that the promise by the company of the performance of a duty enjoined upon it by law, independent of the contract, did not constitute a consideration for the city's promise. To be specific, it followed the Duluth case (Northern Pacific Railroad Co. v. Duluth, 208 U. S. 583), quoting at length from the opinion, including the following:

"The charter of the company, as well as the common law, required the railroad, as to existing and future streets, to maintain them in safety, and to hold its charter rights subject to the exercise of the legislative power in this behalf, and any contract which undertook to limit the exercise of this right was without consideration, against public policy and void."

Such is the rationale of decision in all crossing cases, where contracts between cities and railroad companies have been held to be void.

The many cases cited by defendant's counsel dealing with contracts between municipalities and public service companies, purporting to limit the charges which the latter could exact, known as rate cases, are so obviously distinguishable on principle from the instant case that an analysis of them is deemed unnecessary. As for cases holding invalid contracts entered into by railroad companies for the permanent location of their yards, division points or depots, they announce no new doctrine. Long before the development of the

present great body of public utility law it was generally held by the courts that such contracts were against public policy, and therefore void. They were held to be against public policy, not only because under changed conditions they might require railroad companies to operate uneconomically, but because they tended to actually impair the efficiency of the public service. Those cases are without persuasive influence the one way or the other in the determination of this case.

II. Defendant's second contention is that its team-tracks lying across Oak Street extended south cannot be regarded as "any line of railroad" within the meaning of said Section 8. This contention is without substance. The ordinance granted to the defendant the right to construct over and across the streets of Kansas City its main tracks, "together with such switches, side tracks, team-tracks, connections, cross-overs, switch stands, signals, signal wires, pipes for gas, oil and water, conduits, telegraph and telephone poles and wires, as may be desirable or necessary." Those collectively constitute the "line of railroad" referred to in Section 8. In this connection it may be further said that the evidence abundantly shows that the use of the team-tracks will not be interfered with in any material respect by the proposed viaduct.

III. Defendant's third and fourth contentions will be considered together. It is true, as defendant avers, that Section 8 is not automatically operative. Defendant is bound to construct a viaduct in the performance of its covenants and agreement as set forth in such section, when and only when (a) such viaduct is reasonably necessary to provide for the public traffic and (b) Kansas City has passed a reasonable ordinance fixing the time and place of construction. Whether these conditions, termed by defendant "conditions precedent," have arisen is the question now presented for determination.

The ordinance carries on its face a finding of the Common Council of Kansas City, made while acting in its legislative capacity, that both a widened and extended Oak Street and a viaduct to carry it across defendant's railroad are reasonably necessary to accommodate the public traffic. It is suggested in plaintiff's brief that such a finding is conclusive, in the absence of fraud or collusion. It is no doubt true that the action of a city in the exercise of an expressly delegated governmental power, legislative in character, is not subject to judicial review. [Kansas City v. Hyde, 196 Mo. 498, 506, 96 S. W. 201; Simpson v. Kansas City, 111 Mo. 237, 242, 20 S. W. 186.] But that is not this case. The city is not endeavoring to enforce

its power of eminent domain as against the defendant; neither is it invoking the police power vested in the Public Service Commission to have the cost of the viaduct apportioned to the defendant: it is seeking to have a contract specifically enforced. It entered into the contract in its corporate and proprietary capacity, and through the contract secured the promise of a performance which lay beyond the scope of the governmental power delegated to it as well as that reserved by the State. Through the exercise of the power of eminent domain the city could have widened and extended Oak Street across defendant's right-of-way, but it would have had to pay the damages sustained, actual and consequential; it could have applied to the Public Service Commission for an apportionment of the cost of constructing a viaduct, and thereby secured a small percentage of such cost (see State ex rel. Term. Ry. Co. v. Public Service Commission, 308 Mo. 359); through the contract, for a valuable consideration delivered in advance, it secured defendant's promise both to grant the right of way for the extended street and to build at its own expense the viaduct, upon named terms and conditions. As already pointed out, the city in making the contract did not renounce any of its legislative power, nor did it attempt to barter away any of the police power of the State: there is nothing in the contract to restrain it from extending its streets across defendant's railroad by condemnation and having the costs of viaducts and subways apportioned by the Public Service Commission. But the city cannot pursue that method and at the same time stand on its contract. It was optional with it as to which course it would pursue; having elected to seek specific performance of the contract, it is encumbent upon it to allege and prove that all conditions antecedent to performance by the defendant have been fulfilled. It further appears from said Section 8, when considered as a whole, that it was the intention of the parties that the questions of whether a viaduct in a given case was reasonably necessary to provide for the public traffic and whether Kansas City had passed a reasonable ordinance fixing the time and place of construction should be determined by a court, if the parties could not agree. We accordingly hold that *for the purposes of the contract* they are judicial questions, and that plaintiff having the affirmative must establish such reasonableness by the greater weight of the evidence.

Whether the viaduct in question is reasonably necessary to provide for the public traffic depends upon the existence of a public necessity for widening and extending Oak Street south across defendant's right of way and railroad tracks, because the viaduct is merely incidental to the extension of the street. It is, however, a necessary incident: owing to the contour of the ground a viaduct is the only practicable way in which the street

can be carried across the tracks. We proceed therefore to a consideration of whether an extension of Oak Street south across the railroad is reasonably necessary to provide for the public traffic. The evidence offered upon this phase of the case is too voluminous to be set out at length or even summarized. We shall content ourselves therefore with setting forth such of the pertinent facts as we find from an analysis to have been established by the greater weight of the evidence.

Kansas City, Missouri, as laid out is apparently in the form of a rectangle. The east-and-west streets are numbered from the Missouri River on the north to the southern limits; the evidence discloses that there are at least seventy-nine such streets—there are possibly five or six others south of 79th. There are approximately as many north-and-south streets, but they have been given names instead of numbers. Defendant's railroad runs through Kansas City from the state line on the west to the eastern city limits. It crosses the state line near 25th Street and proceeds easterly, bearing slightly north, until it crosses 18th Street at Benton Boulevard, it then takes a decidedly northeasterly direction. The distance from the state line to the eastern city limits is 7.3 miles. In traversing Kansas City defendant's road runs for the most part along creek bottoms, and in some instances through cuts made to conform with the water grade. So that the general topography in connection with the artificial grades established makes grade crossings of the railroad, generally speaking, impossible. Thirty-four of the north-and-south streets are carried over or under the railroad by means of viaducts and subways: a greater number in reaching that insuperable barrier come to dead ends, in so far as further progress south is concerned.

The principal business district of Kansas City lies, roughly speaking between Sixth Street on the north and Fifteenth Street on the south and between Broadway on the west and Oak Street on the east, having a width of eight blocks north and south and a length of eleven blocks east and west. The streets which come south down through the business district to the railroad, commencing on the west side after leaving Broadway, are as follows: Northwestern Avenue, Central Street, Ft. Scott Avenue, Wyandotte Street, St. Paul Avenue, Baltimore Avenue, *Main Street,* Walnut Street, *Grand Avenue, McGee Street,* and Oak Street—Oak Street is said to run through the "easternmost fringe of the business district." Broadway, Main Street, Grand Avenue and McGee Street cross over defendant's railroad by means of viaducts. Six streets come from the north between Broadway and Main that do not cross the railroad; the Union Station and its environs are located between Broadway and Main; the actual distance from the center of one of these last named streets to the other is 1470 feet, something over a quarter of

a mile. The distance from the center of Main Street to the center of Grand Avenue, Walnut Street intervening, is 656 feet; the distance from Grand Avenue to McGee is 330 feet; and the distance from McGee to Oak Street extended, the site of the proposed viaduct, is 340 feet.

The population of Kansas City in 1910 was 248,318; in 1920, 324,410; at the time of the trial of this case in 1927 it was estimated to be 438,474—an increase of 77 per cent since the granting of the franchise to defendant. The greatest increase in the population occurred in that portion of the city which lies east of Main Street and south of defendant's railroad; the population of that district was estimated by an expert of the Bell Telephone Company in 1925 to be 193,621. In 1926 there were 78,251 registered owners of automobiles and motor vehicles resident in Kansas City. From various statistical matters introduced in evidence it appears that both the population and the owners of motor cars are steadily and progressively increasing.

There occurs daily in Kansas City, commencing at about 4:30 P. M., an exodus from the business district to the south and southeast parts of the city. The great mass of traffic so originating endeavors within a limited time to pass through the "bottle-neck," as it is termed, afforded by the viaducts at Main Street, Grand Avenue and McGee Street. Of these the one at McGee Street is sought by the larger number of the drivers of vehicles: it affords the majority the most direct route home, it is not used by street cars as are the other two, and the street itself is wider, better paved and has easier grades. But there is great congestion on all three during the rush hours. Twenty-second Street, an east-and-west street, crosses McGee Street just south of the viaduct; and Twentieth, another east-and-west street, crosses McGee at the north end of the viaduct. Each of these cross streets carries a considerable volume of traffic. At the intersection of Twenty-second and McGee there are automatic traffic signals which permit the traffic to move north and south for an interval, and then require it to stop for a period while the east-and-west traffic moves. During the rush hours in the late afternoon the automobiles approach the viaduct so rapidly and in such numbers that during an interval when the east-and-west traffic is moving three or four lanes of them extending back from one to three blocks accumulate, and are ready to move the instant the signal lights permit. When that instant arrives they all surge forward, those in the rear hoping to get across before the signals change. It sometimes takes five, ten or even fifteen minutes for a car to cross in these intermittent waves. Many collisions occur, with resulting injuries. The motor-vehicle travel is not so heavy over the viaducts at Grand Avenue and Main Street, but during the rush hours both are traversed

at short intervals by street cars, with the result that traffic conditions with reference to them are but little better than those at McGee Street. With respect to each of the three viaducts the condition during the morning rush hours is somewhat similar to that which prevails in the evening, but is not nearly so bad.

Numerous counts of vehicles passing over each of the viaducts within a given time were made by both plaintiff and defendant, and defendant's experts through comparison with similar counts made at certain viaducts in St. Louis and Chicago expressed the opinion that the viaducts in question could carry at least fifty per cent more traffic than they do. But it is not so much a question of the capacity of the viaducts as that of the streets: it conclusively appears that the three streets—Main, Grand Avenue and McGee—to which the traffic converges at the evening rush hours, cannot accommodate it without intolerable congestion.

Holmes Street, which lies four blocks—1332 feet—east of McGee, crosses the defendant's railroad over a viaduct; Charlotte Street, a block east of Holmes, also crosses over a viaduct; these streets are three and four blocks, respectively, east of the business district, and, as already indicated, Broadway with its viaduct lies on the western boundary of the district. Various reasons were suggested by the witnesses as to why these streets are not more extensively used during the rush hours, such as their narrowness, or the excessiveness of the grades on them, or their use by street cars, or their failure to afford direct routes from the business district to the homes in the southeast part of the city. But whatever the reason the fact remains that the greatest part of the traffic seeks the three viaducts at Main, Grand Avenue and McGee, respectively, to get across defendant's railroad. This notwithstanding the resulting great congestion.

According to the city's experts the Oak Street Trafficway, running south along the eastern boundary of the business district to the southern city limits, will not only relieve the traffic congestion at the three viaducts, but will tend to reduce that in the business district as well: it will enable people to get into that district and out again without having to traverse it with their automobiles. The widened and extended street was designed, however, to serve other purposes in addition to those just mentioned. The city has, or presently will have, two arterial thoroughfares extending through it east and west: one at Sixth Street and one at Fifteenth. It has no such thoroughfare from north to south. The Oak Street Trafficway will supply that deficiency and will also fit into the city's plan to so articulate its thoroughfares with State and Federal highways as to enable tourist and other like traffic to come into or pass through Kansas City without speading out over its already burdened streets.

914

The defendant complains because the city did not select for its north-and-south arterial highway a street on which there is already a viaduct. But the city's evidence tended to show that the property damages which would result from widening the streets suggested by the defendant and reducing their grades in order to make them suitable for the purpose would make the cost prohibitive, and its evidence in that respect was not challenged.

We are of the opinion that the evidence as a whole touching this feature of the case fairly shows that a widened and extended Oak Street, including a viaduct to carry it across defendant's railroad, is reasonably necessary to provide for the public traffic, and we so find.

It appearing that a viaduct at Oak Street is "reasonably necessary to provide for the public traffic," the Viaduct Ordinance, if unreasonable, must be so in respect to the character, size, dimensions, cost, or the location with reference to defendant's team-tracks, of the viaduct which it directs the defendant to construct. From a painstaking examination of the evidence we find the contrary. We hold therefore that "the conditions precedent" of Section 8 have been fulfilled.

IV. Defendant's fifth contention is briefed and argued under another head and will be considered when that is reached in the course of the opinion. Its sixth contention is that a decree compelling it to construct the viaduct at its own expense "would conflict with the Transportation Act and impose a burden upon interstate commerce, in violation of the commerce clause of the Constitution of the United States." In this connection it avers:

"That the Kansas City Terminal Railway Company is an interstate carrier and is required to report to the Interstate Commerce Commission and conform to its classification of accounts; that the investment in the viaduct, if it were constructed, amounting to approximately $350,000, would have to be charged to the account styled: 'Investment in Road and Equipment;' and that the investment in road and equipment account is the one upon which interstate rates are directly based; . . . that the burdens upon the roads in the station have been so heavy that some of the roads have endeavored to repudiate the agreement governing the station; that in order to raise any money, if it could be raised, for constructing the viaduct, the company would have to issue either stock or notes or bonds having a maturity of more than two years, which under the Transportation Act cannot be done without authority of the Interstate Commerce Commission."

The estimated cost of the viaduct is $346,000. If this amount were apportioned equally among the twelve trunk line railroad companies who own the stock of the Terminal Railway Company, each would be required to pay less than $30,000. But aside from that the defense is novel. In its final analysis it is simply this: the defendant ought not to be compelled to perform the contract, although the promise of such performance constituted the consideration in part which it gave for its railroad, for these reasons: that it is now financially embarrassed; that it may find it necessary to borrow money; and that in the event it does have to borrow money it will first have to show the Interstate Commerce Commission that it is necessary for it to do so. Neither insolvency nor the difficulty attendant upon the borrowing of money with which to perform constitutes a defense to an action to enforce a contract, unless made so by the contract itself. It is not a defense in this case. Nor does the claim, that if the defendant be required to discharge a valid obligation entered into by it for the purpose of acquiring in part its railroad property, such requirements will burden interstate commerce in violation of the commerce clause of the Constitution of the United States, merit serious consideration. Defendant's contentions under this head are disallowed.

V. Defendant's seventh contention is that the Viaduct Ordinance does not conform to the Union Station Ordinance, in these respects:

(a) Under Sections 6 and 7 of the Union Station Ordinance, referred to in Section 8, the Terminal Railway Company was required in the first instance to prepare and submit to the Board of Public Works for its approval plans for certain specified viaducts and subways; whereas, the Viaduct Ordinance requires the construction of a viaduct according to an exact plan, which has been approved by, and is on file with, the Board of Public Works.

(b) Section 8 of the Union Station Ordinance provides that the Terminal Railway Company shall maintain the viaducts constructed by it under the provisions of said section; whereas, the Viaduct Ordinance provides that the city shall maintain the Oak Street Viaduct, but that the Railway Company shall reimburse the city for all moneys expended for such maintenance.

(c) Under Section 19 of the Union Station Ordinance it was agreed that Kansas City would by ordinance require the first person or corporation desiring to use any viaduct constructed by the Terminal Railway Company, in operation of a street railway, to pay to the Company one-half of the cost of the viaduct, and that the Company should retain such interest in any such viaduct as would be necessary to enforce the stipulated payment; whereas, the Via-

duct Ordinance merely provides that the viaduct at Oak Street, when constructed, "shall be the property of Kansas City, as and for a public highway."

(a) Section 8 does not provide that the Terminal Railway Company shall prepare and submit plans for the construction of viaducts and subways constructed by it; it merely requires "such construction and maintenance to be of like character and under like supervision with the construction and maintenance provided for the viaducts and subways mentioned in Sections 6 and 7." There is in that respect therefore no lack of conformity to it by the Viaduct Ordinance. If there were such a discrepancy, the defendant could not well complain of it. From the beginning it has steadfastly refused to recognize any obligation on its part to construct a viaduct at Oak Street, and it has accordingly consistently refused to submit any plan therefor. [State ex rel. v. Public Service Commission, 308 Mo. 1. c. 382.]

(b & c) The provisions of the Union Station Ordinance with reference to the title and maintenance of viaducts constructed by defendant are collateral to the principal obligation to construct, the one sought to be enforced in this suit. After the viaduct in question has been constructed, defendant's rights touching the title or its maintenance, if called in question, can be determined in a proper proceeding brought for that purpose.

VI. Defendant's eighth contention is that Section 8 of the Union Station Ordinance and the Viaduct Ordinance violate both the State and Federal constitutions. In support of the contention it says:

"We contend that the case falls within the exception recognized in Erie Railroad Company v. Board of Commissioners, 254 U. S. 394."

That case is not in point: it is one dealing solely with the police power. This is a suit to compel the specific performance of a contract. The contract is a valid one; the parties to it were competent; the performance sought falls clearly within its terms and intent. Its enforcement as against defendant cannot in reason violate any constitutional right.

VII. Defendant's ninth contention has been disposed of. Its final insistence is that plaintiff, if entitled to relief at all, is not entitled to specific performance. The contention is based essentially on the following grounds:

(a) Plaintiff has an adequate remedy at law; (b) plaintiff's bill, by asking the enforcement of but a single provision of the contract,

seeks to have the contract enforced in piecemeal fashion; (c) the contract lacks mutuality; (d) plaintiff itself has breached the contract; (e) the city has not yet acquired the necessary right of way for the viaduct under the condemnation proceedings contemplated by the Viaduct Ordinance; (f) specific performance is a discretionary remedy and under the facts of this case should be denied.

(a) It is manifest that neither an action for damages nor one in *quo warranto* would afford plaintiff adequate relief. Neither is mandamus an appropriate remedy where, as here, the rights of the parties rest in part on facts which are controverted. Nor is the general rule that courts of equity will not undertake the specific enforcement of a building contract applicable; in cases like this specific performance is the only adequate remedy. [Owens v. Railroad, 110 Mo. App. 320, 85 S. W. 987; Blair v. Railroad, 92 Mo. App. 538 and cases there cited.] The employment of the remedy stipulated in said Section 8: that, in the event the Railway Company refused to construct a viaduct when an obligation to do so accrued, the city might build it and recover from the Company the expenses, is by the express terms of the stipulation made optional with the city. It elected to pursue the remedy provided by law instead, and that it had the clear right to do.

(b) It is true that a court of equity usually deems it neither wise nor just to enforce one or more of the promises in a contract unless it can enforce all of the contract outstanding at the time of the suit, including the promises of the plaintiff as well as those of the defendant. [3 Williston on Contracts, sec. 1430.] But in this case the contract has been performed by plaintiff. The covenants and agreements on the part of defendant as embodied in said Section 8 constitute the outstanding unperformed part of it. The defendant has received and enjoys the consideration given for these promises: equity can and ought to enforce them as and when performance, under the stipulated conditions, becomes due.

(c) The doctrine of mutuality is without application where plaintiff has performed his part of the contract and then seeks specific performance on the part of defendant. [3 Williston on Contracts, sec. 1439.]

(d) The agreement alleged to have been breached by the city is the one mentioned above in Paragraph V (c). It is claimed that franchises were granted to the Kansas City Railways Company and to Kansas City Public Service Commission in violation of the provisions of said Section 8. A reading of the ordinances passed by Kansas City in connection with those grants shows that they are in substantial compliance with the provisions just referred to. We do

not deem it necessary to set them out and thereby further lengthen an opinion already too long.

(e)   This objection can be taken care of in the decree.

(f)   It cannot be said that the contract which plaintiff seeks to have specifically performed is grossly unfair, or that defendant in performing it will sustain a hardship out of proportion to the value of the performance to plaintiff.   Railroad companies, while they render a public service, are organized and operated for private gain.   One of them cannot expect to be allowed to bi-sect a great city, crossing its streets and thoroughfares, with its lines of railroad without its constructing at its own expense safe and suitable crossings.   The requirement that it do so is an ordinary incident of railroad ownership and operation.   The fact that defendant would have escaped a part of the expense of constructing a viaduct at Oak Street owing to the contour of the ground at that place, had it not voluntarily contracted to assume all, does not render the performance of its contract a hardship.

The points made by plaintiff, as appellant, and what defendant refers to as its incidental contentions, are covered by what has been written.   Both sides agree that the judgment below cannot stand.

On the whole we conclude that plaintiff is entitled to the relief it asks.   Accordingly, the judgment of the circuit court is reversed and the cause remanded, with directions to that court to enter a decree as prayed in the petition, retaining jurisdiction to make such modifications and such other, further and additional orders, as may be necessary to render said decree effectual.   All concur, except *Atwood, J.*, not sitting, and *Blair, J.*, who dissents in a separate opinion.

BLAIR, J. (dissenting).   I am convinced that the conclusions reached in Paragraph I of the majority opinion are unsound and in conflict with the rulings of this court since the Public Service Commission Act was passed in 1913, as well as in conflict with rulings of the United States Supreme Court and the courts of last resort of the other states.

In the majority opinion, it is said: "The precise question here involved is whether the ordinance contract, and particularly Section 8, does in fact limit, abridge or hamper the exercise of the police power of the State."   The subject of the crossing of one railroad or street car line by another or the crossing of either by a public highway is a matter of great public concern and is a subject so affecting the public safety and welfare as to bring such subject within the power of the State to regulate and control it under its police power.   Hence, any contract which undertakes to deal with and control anything affecting such subject limits and abridges the police power of the State.

It may be conceded that, prior to the passage of the Public Service Commission Act and in the absence of any other action upon the subject by the General Assembly, Kansas City had full right and power to regulate and control all railroad crossings within its limits and to contract with respect to the burden of the cost thereof. But this power was exercised under the possibility that the State itself might take over the whole or any part of such subject to the entire exclusion of future control thereof by the city and unhampered by any contracts previously made by the city affecting so much of the subject as the State elected to take under its control.

This is exactly what the State did in 1913 when the Public Service Commission Law was enacted. Section 50 of that act (now Sec. 10459, R. S. 1919) provides that "the commission shall have the *exclusive* power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, *maintenance, apportionment of expenses,* use and protection of each crossing . . . of a public road or highway by a railroad," etc. (Italics my own.)

Section 8 of the ordinance undertook to deal with the subject of payment of the expense of installation and maintaining crossings in said city by means of viaducts and subways. Thereafter the apportionment of the expense of such crossings was by the Public Service Commission Law placed within the *exclusive* power of the Public Service Commission to determine. The ordinance provisions requiring the Terminal Company to pay the entire cost was thereupon superseded by the statute.

The ordinance under consideration did not make any specific contract respecting the crossing at Oak Street. The provision contained was general in terms and looked to the future and purported to place upon the Terminal Company the expense of construction and maintenance of each and every viaduct or subway the city, under the terms specified in the ordinance, might require said company to construct and maintain during the full two hundred years of the life of the ordinance. If that provision is controlling and exclusive as to a crossing conceived and required to be built ten or twelve years after the ordinance was passed and accepted, it must be held to be equally controlling during the full two-hundred-year term of the ordinance. Merely to assert such a proposition is to demonstrate the invalidity of the provision as against the exercise by the State of its police power over the identical subject.

Upon the enactment of the Public Service Commission Act the manner and point of crossing and the terms of installation, operation and maintenance, together with the apportionment of the expense of the crossing, at once became a subject about which railroads and municipal corporations could make no contracts binding on the

Public Service Commission, to which was confided the exclusive power of determination as to those subjects. The very language of Section 10459 precludes the thought that, after the passage of the Public Service Commission Act, any contracts could be made by the city and the company with respect to the apportionment of the expense of the proposed Oak Street viaduct, which would be binding upon the Public Service Commission in the exercise of its exclusive power to determine for itself how the cost of the erection and maintenance of such viaduct should be apportioned.

The fact that the franchise ordinance, including the provisions of Section 8, antedated the passage of Section 10459 of the Public Service Commission Act does not prevent the Commission from the exercise of its exclusive power to determine the apportionment of the expense of the construction and maintenance of the proposed Oak Street viaduct. Neither inferior governmental agencies within the State nor the General Assembly itself, under our Constitution, has the power by contract to deprive the State of its right to exercise its police power. Provisions of franchise ordinances, whether passed before or after the enactment of the Public Service Commission Law, which deal with subjects coming within the police power of the State, must be regarded as having been enacted with reference to and in recognition of the full power and duty of the State, in the rightful exercise of such police power, to deal with such subjects without regard to and unembarrassed by prior or subsequent contracts in relation to such subjects.

The majority opinion considers at some length whether Section 8 of the ordinance is regulatory or contractual. To my mind it makes not the slightest difference how we regard it. To contend that said provision is an inviolable contract and can be specifically enforced by the courts, notwithstanding the General Assembly, in the exercise of the State's police power, has declared that the Public Service Commission shall have the *exclusive* power to apportion the cost of such construction and maintenance, is to deny the power of the State to legislate on the subject and to ignore controlling decisions in this and other jurisdictions, as well as numerous cases in point on the general principle involved.

State ex rel. Railroad Companies v. Public Service Commission, 271 Mo. 270, 197 S. W. 56, was a case where the Public Service Commission required the widening and reconstruction of a subway in Moberly. At the time of the original construction of the subway in 1887, it was agreed that the city and the railroad company would each pay one-half of the cost of any subsequent repairs or changes made in the subway. The existence of this contract was set up as precluding the power of the Public Service Commission to assess against the railroad companies more than one-half of the cost of

widening and reconstructing the subway. At page 287 (271 Mo.), Judge WILLIAMS, speaking for the Court en Banc, said:

"Assuming (but without deciding) that the above mentioned contract was in fact duly executed as the law requires of contracts executed by a municipality, yet the contract cannot avail the appellant in this proceeding, for the reason that such a contract is void as against public policy in that, if held valid, it would amount to a limitation on the exercise by the State of its police power."

In Northern Pacific Railway Co. v. Duluth, 208 U. S. 583, the contract required the city to keep the viaduct in repair for fifteen years and to maintain the approaches perpetually. Within the period of fifteen years thereafter, the city, through a mandamus proceeding in the Minnesota courts, compelled the railroad to improve the viaduct at its own expense, contrary to the provisions of the contract. The United States Supreme Court affirmed the action of the Minnesota courts and in doing so said: "The result of these cases is to establish the doctrine of this court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution."

In Chicago, etc., Railroad v. Nebraska, 170 U. S. 57, the railroad and the city of Omaha had contracted concerning the expense of constructing a viaduct. Although there was no express agreement as to repairs and maintenance, the court, upon the assumption that the duty under the contract may have been upon the city when the contract was made, said that, "In view of the paramount duty of the Legislature to secure the safety of the community at an important crossing within a populous city, it was and is within its power to supervise, control, and change such agreements as may be, from time to time, entered into between the city and the railroad company, in respect to such crossing, saving any rights previously vested. Any other view involves the proposition that it is competent for the city and the railroad company, by entering into an agreement between themselves, to withdraw the subject from the reach of the police power, and to substitute their views of the public necessities for those of the Legislature." The requirement of the city ordinance, under authority of subsequent legislation by the State, that the railroad companies crossed by the viaduct should repair said viaduct at their own expense, was held to be a valid exercise of the police power, notwithstanding provisions of the contract to the contrary.

In the City of Cape Girardeau v. St. Louis-San Francisco Railway Company, 305 Mo. 509, 267 S. W. 601, quite a similar situation arose. One of the provisions of the ordinance granting the railroad

the use of the city streets was that the railroad should maintain at Cape Girardeau shops for making light or running repairs on its equipment. The railroad proposed to move its shops and the city sought to enjoin such action under the provisions of said ordinance. The injunction was denied on the ground that the ordinance provision was one affecting the proper operation of the railroad, which the State in the exercise of its police power had intrusted to the Public Service Commission. The Court en Banc there said: "Neither the State nor any of its agencies has or ever has had the power to contract away the police power of the State and . . . franchises granted or ordinances passed by cities affecting subjects and matters, coming within the police power of the State, must be considered as having been granted or passed with reference to the power of the State, in the exercise of its police power, to legislate with respect to such matters and subjects, unfettered by provisions of such franchises and ordinances."

In Southwest Missouri Railroad Co. v. Public Service Commission, 281 Mo. 52, 219 S. W. 380, the Court en Banc ruled that the Public Service Commission had jurisdiction to authorize a street railway company to abandon and remove part of its tracks which were operated at such a loss as to impair its ability to give service, notwithstanding a franchise provision required the street car company to operate cars upon all streets covered by its franchise.

There are a great many decisions, involving rates for the service rendered by public utilities, where franchise provisions fixing rates have been held not to be binding upon the State in the exercise of its police power. Such cases are clearly in point. In State ex rel. Sedalia v. Public Service Commission, 275 Mo. 201, 204 S. W. 497, it was held that the franchise rate for hydrant rental was not controlling upon the State acting through its Public Service Commission in fixing reasonable and just water rates. In Fulton v. Public Service Commission, 204 S. W. 386, it was held that the Public Service Commission was not bound by provisions of a telephone company franchise fixing maximum rates for telephone service. In St. Louis v. Public Service Commission, 276 Mo. 509, 207 S. W. 799, it was held that the Public Service Commission was not bound by franchise provisions as to rates of fare in fixing reasonable and just fares for street-car service.

Citation of cases could be made at great length, but they are all to the same general effect, to-wit, that all contracts between cities and their public utilities, which have a bearing upon the public safety and welfare and the ability of such public utilities to render efficient public service, are made with reference to and in recognition of the power and duty of the State itself, or through its lawfully authorized agent, the Public Service Commission, in the exercise of

the police power of the State, to make orders, rules and regulations in respect to the subjects affected by such contracts unhampered and unembarrassed by existing contracts; that, when cities and other utilities enter into contracts of that character, they do so with reference to and in full recognition of the power of the State in the exercise of its police power to enact laws inconsistent with and subversive of such contracts.

Applying these rules to the case at bar, when the State of Missouri passed the Public Service Commission Act and provided that the Commission should have *exclusive* power to determine and prescribe the manner, including the particular point where, a street should cross a railroad and the terms of installation, operation, maintenance and apportionment of expense thereof and to require separation of grades where practicable and to prescribe the terms upon which such separation shall be made and the proportions in which the expense of such separation of grades should be borne, all rights of the city to have additional viaducts or subways constructed and maintained at the sole expense of the Terminal Company were terminated, notwithstanding the specific contract on the point, and the whole question of the apportionment of the expense of the construction and maintenance of such viaducts and subways was delegated to the Public Service Commission for determination upon considerations wholly independent of the provisions of Section 8 of the franchise ordinance.

The main reliance of the city in the case at bar is upon the opinion of Division One of this court (erroneously marked in our official reports as a decision by the Court en Banc) in State ex rel. Terminal Railroad Company v. Public Service Commission, 308 Mo. 359. In 272 S. W. 957, the case is properly reported as a decision by Division One. The majority opinion in the case at bar does not cite the case as supporting the conclusion reached therein. The reason probably is that every thing said therein about enforcing specific performance of Section 8 of the ordinance is clearly *obiter*.

The majority opinion cites M. K. & T. Railroad Co. v. Oklahoma, 271 U. S. 303, but does not set out its facts and conclusions. That is the only case cited by the city which seems to lend any support to its contention that the provisions of Section 8 of the ordinance do not limit the police power of the State and hence are binding upon it, notwithstanding the subsequent passage of the Public Service Commission Law. In that case there was a specific agreement that if at any time the city desired to extend and open a particular street, to-wit, Commanche Street, where the underpass in controversy was to be built, the crossing should be made under the tracks and at the sole cost and expense of the city and the consideration for this agreement was the agreement of the railroad company to waive all

claim for damages for right of way caused by the opening and establishing of the underpass. The court held that it was competent for the city to acquire the right of way by contract, purchase or condemnation. It could not take the right of way without compensation. It paid for the future right of way by its contract to bear the entire cost of the crossing. It was authorized to make the contract for compensation for such right of way in advance of the need of the right of way. The railroad company's agreement to grant the right of way for the crossing was a valid consideration for the city's agreement to bear the cost of construction. The agreement was concerning the right of way for and cost of crossing a specified street and was not a general plan covering all crossings which might become necessary during a long period of years, as was provided in the ordinance in the case at bar. It was a valid and binding agreement when made. The rights of the city and the railroad in respect to the particular crossing thereby became vested. For these reasons the order of the corporation commission assessing one-half of the cost of the underpass to the railroad company impaired the obligation of a subsisting contract and was invalid.

The court fully recognized the rule that the provisions of contracts will not be enforced where such provisions operate to hamper the State in the exercise of its police power in relation to the construction of railroad crossings and the assessment of the cost of their construction and maintenance, but was of the opinion that the enforcement of that particular contract would not have that effect.

I regard the cases of Northern Pacific Railway Co. v. Duluth, supra, and Chicago, etc., Railroad v. Nebraska, supra, as fully supporting the contention of the company in the case at bar. The same court which decided the Duluth and Nebraska cases was able to distinguish the Duluth case from the Oklahoma case without overruling or criticising that case. If the Oklahoma case can properly be understood as holding that contracts of that sort generally do not hamper the State in the exercise of its police power, it must be deemed to be in conflict with numerous pronouncements of this court and the courts of other states and the United States Supreme Court itself.

The majority opinion holds that ''if a contract between a municipality and a railroad requires the latter to bear all the expense of a crossing, the contract is not in that respect a limitation of the police power: by its exercise the railroad could not be coerced into paying more.''

This is a remarkable pronouncement in view of Section 50 of the statute of 1913 and the decisions of this court and of the other jurisdictions holding that franchise agreements in respect to rates and

service of public utilities are not binding upon the State in the exercise of its police power over such subjects. The underlying principle of the rule that public utility rates may be increased above rates specified in the franchise is that such public utility cannot bind itself to charge a rate or to perform a service which will destroy or seriously impair its ability to render efficient public service. Nor is the State bound by franchise provisions concerning rates which enable the utility to charge more than is reasonable and necessary to enable it to render such efficient public service. If the State, in the exercise of its police power, is not bound by a franchise provision as to rates for public service, it is not bound by franchise provisions requiring expenditures, capital or operating, which are. necessarily and directly reflected in rates. A reasonable return upon the capital invested is just as much an element for consideration in fixing reasonable rates as operating expenses. To deny the State the power to pass upon the reasonableness of or the necessity for capital expenditures is to impair its power to fix reasonable rates and charges. But, aside from these general principles, to assert that the ordinance provision under consideration does not limit the police power of the State is to ignore the plain language of the statute giving to the Public Service Commission the *exclusive* power of determination in respect to the very subject-matter of said provision.

I am convinced that the trial court had no power specifically to enforce the provisions of Section 8 of the ordinance and that its decree ordering such specific performance was unauthorized. The contrary conclusion has been reached by the majority. Hence, I respectfully dissent.