STATE EX REL. ALTON RAILROAD COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION.—70 S. W. (2d) 57.

Division One, March 14; 1934.

*Charles M. Miller* for appellant.

*D. D. McDonald, G. C. Murrell, Fred A. Boxley* and *Rufus Burrus* for respondent.

HYDE, C.—This case, coming to the writer by reassignment, is an appeal by the Alton Railroad Company from the judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission requiring the railroad to contribute to the cost of widening a viaduct. In 1931, Jackson County made application to the commission for an order authorizing the widening of a concrete viaduct, between Kansas City and Independence, where Van

Horn Road crosses the railroad's track, and apportioning the cost thereof. The estimated cost ·of the work was $47,539.80. The answer of the railroad made substantially the same allegations as were made in its answer in State ex rel. Alton Railroad v. Public Service Commission, 334 Mo. 985, 70 S. W. (2d) 52, decided concurrently herewith.

The viaduct had been built in 1914 pursuant to an order of the Public Service Commission, which apportioned the cost sixty per cent to the railroad and forty per cent to the county. The viaduct was 448 feet long and thirty-four feet wide. The county, as a part of its $10,000,000 road program had rebuilt Van Horn Road, three miles in length connecting Kansas City and Independence, by increasing its width from twenty-five to forty-one feet so that it would accommodate four traffic lanes. The county proposed that the 34-foot viaduct be widened to fifty-two feet so that it would have a roadway forty-two feet wide, sufficient for the four traffic lanes of the highway, and also have 5-foot sidewalks on each side. Its plan for widening it was to build equal additions on both sides, supported by steel encased in concrete, cantilevered from rows of new supporting columns placed on each said of the viaduct.

It was shown that Van Horn Road was expected to be the principal artery between Kansas City and Independence; that it connected with Fifteenth Street, which had been widened to 100 feet all the way to Baltimore Avenue on the west side of the business district of Kansas City; that Van Horn Road also had a 100-foot right of way between the two cities; that the new four-lane paving had been constructed the year before so as to widen and straighten the former narrower road; that it had eliminated many dangerous curves; and that its total cost was about a quarter of a million dollars. It was shown that the entire length of the road was developing as a commercial district; that many stores, offices and other business buildings had already been constructed on both sides of Van Horn Road; that many residential districts were being built up nearby; that 35,000 people lived between the two cities; that the Kansas City school district had purchased a site thereon for a new high school; and that there were other schools already established in the vicinity. A week's traffic check in July, 1931, showed that between ten and twelve thousand automobiles passed daily over the viaduct. There was testimony that "the population in Independence increased from eleven to sixteen thousand in the last census, and the population of Kansas City seventy thousand in the last census. Jackson County, outside of Kansas City and Independence, increased nearly fifty per cent, and with this development that is going to be in there, the increase in the next ten years makes it absolutely essential for a four-lane trafficway to be made on Van Horn Road." The engineers for the county were positive in their statements that the viaduct must be

made wide enough to carry four lanes of travel. It was shown that there had been a number of accidents on the viaduct and that automobiles had run against the banisters of the bridge and broken off parts of them.

The evidence for the railroad company showed that its right of way was only 100 feet wide; that the viaduct also crossed a creek which required some kind of a structure over it; that there were no sidewalks on the highway; that few pedestrians used the viaduct; and that, if the road had been built so that the entire width could have been added on one side of the viaduct, instead of on both, the cost would have been only one-half of the proposed expense of widening by building on both sides. The chief engineer of the railroad estimated that it would be possible for ten times the number of cars, indicated by the traffic counts, to pass over the viaduct each day, traveling thirty miles per hour, spaced fifty feet apart and moving in two traffic lanes.

█ The commission found that the heavy travel required a highway with four lanes of traffic; that the present viaduct would only accommodate three lanes; that the convergence of the lanes in the viaduct created a hazardous condition; and that the safety of the traveling public required that it be widened to conform with the width of the road leading to it. It also found that sidewalks were necessary for the safety of pedestrians and that they could be added more economically in connection with widening the roadway than at a future time. The commission ordered the reconstruction of the viaduct and proportioned the cost twenty per cent to the railroad and eighty per cent to the county and ordered that the county should maintain it. The commission stated that in making this apportionment it took into consideration the facts that the railroad right of way was less than one-fourth of the total length of the viaduct; that the widening of the road had caused increased traffic; that the cost would have been reduced if the road had been built so that the widening could have all been made on one side; and that it had reduced the apportionment of the railroad for these reasons.

This case is similar in some respects to the Noland Street road case, 334 Mo. 985, 70 S. W. (2d) 52, decided concurrently herewith. The same contentions are made concerning the authority of the Public Service Commission and the violation of constitutional provisions because this is not a grade crossing and upon those points it is ruled by that case. In this case, however, the present viaduct was built in 1914 in compliance with an order of the commission separating the grade. It is the contention of the railroad that this order "finally adjudicated and determined the full and complete liability of the railroad in connection with the separation of the then existing grade crossing on Van Horn Road, and that if the county, for alleged traffic reasons which involves no question of safety, desires a wider viaduct,

998

it should bear the expense thereof, and this commission is without any jurisdiction, power or authority to apportion any of the cost of a wider viaduct, such as proposed by the county, against the railroad.''

We cannot believe that the Legislature intended that when the commission makes a grade separation it must decide then and forever what kind of a structure shall be constructed for the use of all future generations, regardless of increases in population or in traffic or changes in other conditions which may develop thereafter. Surely the authority of the commission is not limited to the one act of separation of the grade? Authority to require separation is given by subsection 1, Section 5171, Revised Statutes 1929, but subsection 2 thereof reads as follows:

''*The commission shall have the exclusive power to determine and prescribe the manner,* including the particular point of crossing, *and the terms* of installation, *operation, maintenance, apportionment of expenses, use and protection* of each crossing of one railroad by another railroad or street railroad, and of a street railroad by a railroad, and of *each crossing of a public road or highway by a railroad* or street railroad and of a street by a railroad or *vice versa,* so far as applicable, and *to alter* or abolish any such *crossing,* and to require, where, in its judgment, it would be practicable, a separation of grades at any such crossing heretofore or hereafter established, *and to prescribe* the terms upon which such separation shall be made and *the proportion in which the expense of the alteration* or abolition *of such crossings* or the separation of such grades *shall be divided between* the railroad or street railroad corporations affected or between *such corporations and* the State, county, *municipality* or other public authority in interest.'' [Italics as made by this court in State ex rel. M.-K. & T. Railroad Co. v. Public Service Comm., 271 Mo. 270, 197 S. W. 56.]

Moreover, Section 5251, Revised Statutes 1929, states:

''The provisions of this chapter shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities.''

This rule of construction expresses the same thought, which was once thus stated: ''The letter killeth, but the spirit giveth life.'' [II Cor., 3, 6.] Unless given a strained construction, the letter seems broad enough to cover the situation here. If it is necessary to get more traffic between two points than an existing road will carry, that result may be accomplished either by building a new road by another route, or by widening the existing road. If a new road is built and it must cross a railroad, the commission would have power under the statute to require a new viaduct (''prescribe the manner, including the particular point of crossing and . . . apportionment of expense''). If the existing road is widened, would it not have power

to order the widening of an existing viaduct carrying the road across a railroad? ("To alter . . . such crossing . . . and to prescribe . . . the proportions in which the expense of alteration . . . shall be divided.") In either case the State is merely requiring means for getting its citizens, who desire to travel between the two points, safely across the railroad. The policy of this State toward railroads is declared in Section 14, Article XII, of our Constitution, as follows: "Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways." As such, the power or eminent domain is conferred for their establishment. Nevertheless, the State remains "the soverign of the soil" upon which they are located. [Erie Railway Co. v. Public Utility Commissioners, 254 U. S. 394, 41 Sup. Ct. 169, 65 L. Ed. 322.] "The tenure of the railroad corporation is in the nature of a trust for public use, subject to the supervision of the government." [St. Louis-San Francisco Ry. Co. v. King, 329 Mo. 1203, 50 S. W. (2d) 94.] The State has the right to build its other public highways, for travel by other means, over, across or under the railroad. To accommodate such travel, it has the right to build new roads across railroads at new places and provide for the necessary kind of crossing, or to widen existing roads and alter such crossings already established, as the public interest may in either case reasonably require. If it did not, it would no longer be the sovereign.

To exercise its police power for the preservation of the public safety, this State has through the Legislature designated the Public Service Commission as the exclusive agency to determine and prescribe the manner and point of new crossings and to alter or abolish established crossings. apportion the expense, either of making new crossings or alterations of existing ones, and to provide for their maintenance.

"*Salus populi suprema lex esto*" is the fundamental principle of the police power of the State, as well as our State motto. Private corporations, accorded the privilege of operating railroads, declared to be public highways of the State, for the purpose of private profit, must pay a reasonable proportion of the cost of improvements, which the presence of their tracks make or contribute to make necessary, for the welfare and safety of the people of the State. We, therefore, hold that the Public Service Commission has the authority not only to provide for a separation of a grade between a public highway and a railroad, when conditions make that necessary and proper, but that it also has the power, whenever the manner of crossing formerly prescribed by it becomes inadequate in width, height or strength to reasonably provide for the safety and welfare of the traveling public thereon, to order it reconstructed to meet their reasonable needs.

The railroad also contends that the apportionment was unfair, unjust and unreasonable because, not being a grade crossing, there

was no question of protecting the public from trains; because no reasonable necessity was shown for the project and the present viaduct was adequate; and because there could be no possible benefit to the railroad. The burden of making this showing is upon the appellant. Elimination of danger of collision between vehicles and trains and benefit to the railroad because of that or other reasons is to be considered in proportioning costs, but these matters are not alone controlling. Nor is benefit the fundamental consideration in proportioning expense. The true basis of apportionment of the cost has been declared by this court to be the extent to which the presence of the railroad at the place enhances the cost of a necessary improvement. [State ex rel. Kansas City Terminal Railroad Co. v. Public Service Comm., 308 Mo. 359, 272 S. W. 957.] If the presence of the railroad is the sole cause of an improvement necessary for the public safety, it may be required to pay the entire cost. [Chicago, Rock Island & Pacific Ry. Co. v. Public Service Comm., 315 Mo. 1108, 287 S. W. 617.] Approaches are properly considered, as necessary parts of an overhead crossing, in making the apportionment of cost. [Chicago, Rock Island & Pacific Ry. Co. v. Public Service Comm., supra; State ex rel. Mo. Pac. Ry. Co. v. Public Service Comm. (Mo.), 297 S. W. 47.]

■ The present viaduct was built in 1914. It is on a principal trafficway between Kansas City and Independence. The evidence shows that there has been a great increase in the population of both Kansas City and Independence, between 1920 and 1930, and that the rural area of the county, outside of those two cities, has nearly doubled in population during that time. To provide for this travel within its limits, Kansas City has widened Fifteenth Street to 100 feet all the way from its business district to its connection with Van Horn Road. The census of 1930 compared with that of 1910, the last prior to the building of the present viaduct, shows an increase of more than 150,000 in Kansas City alone and almost 200,000 in the whole county. The development of motor transportation and the increase in traffic created thereby has been in much greater proportion than the increase in population. It was shown that Van Horn Road is developing into a commercial district in addition to being an important connecting trafficway; that at certain periods of the day traffic is much more congested than at others; that, to accommodate the travel now using the road and the constantly increasing demands which such rapidly growing communities will develop, the county has built a 41-foot pavement for four traffic lanes; that the bridge will only accommodate three, so that the lines must there converge; that the bridge was not of the most modern construction, built for maximum visibility of approaching traffic; but that it had a rather high arch, with a five per cent grade, so that cars cannot be seen ahead thereon much more than 200 feet. It appears from de-

fendant's own evidence that traffic on Van Horn Road moves at about an average of forty-five miles per hour (66 feet per second), which we cannot help but know was not true when the bridge was originally built. It is obvious that insufficient visibility and converging lines of rapidly moving congested traffic can only create a hazardous situation, sure to cause many disasters. In the interest of public safety, such a condition requires some relief. Upon this record, we can neither say that the manner proposed is improper nor that the apportionment of one-fifth of its cost to the railroad is unreasonable.

We overrule the railroad's contentions concerning its financial condition for the reasons stated in the Sterling Avenue Subway case, 334 Mo. 1001, 70 S. W. (2d) 61, decided concurrently herewith.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.