STATE of Missouri ex rel. KANSAS CITY, Missouri, a Municipal Corporation, Relator-Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, and Marvin E. Jones, Chairman, et al., Respondents,

Kansas City Terminal Railway Company, Intervenor-Respondent.

No. 58285.

Supreme Court of Missouri, En Banc.

June 9, 1975.

Rehearings Denied July 14, 1975.

Aaron A. Wilson, City Atty., Carrol C. Kennett, Asst. City Atty., Kansas City, for relator-appellant.

William M. Stapleton, Sam D. Parker, Kansas City, Thomas J. Downey, Jefferson City, for intervenor-respondent.

FINCH, Judge.

This is an appeal from a judgment affirming an order of the Public Service Commission (P.S.C.) that directed repairs to and reconstruction of certain viaducts over tracks of Kansas City Terminal Railway Company (Terminal) and apportioned the costs thereof between Terminal and Kansas City (City). An opinion affirming that judgment was written in Division I. On the court's own motion, the case was then transferred to the court en banc. After reargument, the divisional opinion failed of adoption and the case is now written on reassignment. We reverse and remand with directions.

No issue is raised as to the right of the P.S.C. to direct the work on the viaducts. The question to be determined is whether the cost thereof is to be borne by Terminal pursuant to a prior contract between it and City wherein Terminal agreed to assume all such expense or whether that contractual provision was abrogated by adoption of the Public Service Commission Act or by the 1963 amendment of that Act.

In 1909 City and Terminal entered into a contract that awarded Terminal a 200 year franchise for the operation of its system within the city, including the right to use city streets and alleys for that purpose. As part of the agreement City agreed to and did vacate various streets, alleys and public places in order to make right-of-way available for Terminal. One hundred and two such tracts were involved. In return, Terminal assumed certain obligations, including an agreement to bear the expense of construction, maintenance and reconstruction, if necessary, of certain specifically designated viaducts over Terminal's tracks, plus such other viaducts or subways as might be required during the term of the franchise. This contract was embodied in an ordinance which was submitted to and approved by the voters of Kansas City and then formally accepted by Terminal.[1]

In 1922 City determined that public necessity required a viaduct over Terminal's tracks at Oak Street and it called upon Terminal to construct such a viaduct pursuant to provisions of the 1909 contract. Terminal refused to comply, following which a proceeding was instituted before the P.S.C. seeking approval of the proposed viaduct and a direction to Terminal to erect it. The Commission approved the viaduct and directed that Terminal should bear the

1. Additional details of the franchise arrangement are set out in the opinion of the court in Kansas City v. Kansas City Termi- nal Ry., 324 Mo. 882, 25 S.W.2d 1055 (banc 1929).

cost of construction and maintenance. Terminal sought review of that order. This court affirmed the order of the P.S.C. insofar as it determined that a viaduct should be constructed at Oak Street in accordance with an approved plan, but reversed the judgment insofar as it allocated the cost of construction and maintenance of the viaduct. State ex rel. Kansas City Terminal Ry. v. Public Service Commission, 308 Mo. 359, 272 S.W. 957 (1925). That opinion held that the decision as to where and when a viaduct should be constructed was one to be made by the P.S.C., but that the Commission should leave for determination in an appropriate forum the interpretation and enforcement of the alleged contract with respect to cost of such viaducts.

Subsequently, City instituted an action in the circuit court to compel Terminal to comply with its contractual obligation to build and pay the cost of the Oak Street viaduct. In Kansas City v. Kansas City Terminal Ry., 324 Mo. 882, 25 S.W.2d 1055 (banc 1929), this court held that the 1909 contract between City and Terminal was a valid contract supported by consideration; that it did not limit, abridge or hamper the exercise of the police power of the state; and that enactment in 1913 of the Public Service Commission Act did not abrogate the 1909 contract or destroy the right of the City thereunder to have viaducts paid for by Terminal. Accordingly, the court directed specific performance of Terminal's obligation to construct and pay for the Oak Street viaduct.

In 1969 information reaching the P.S.C. caused it to undertake an investigation of the safety of the Prospect Avenue and Main Street viaducts over Terminal's tracks in Kansas City. Both Terminal and City were ordered to appear and present facts concerning the safety of these viaducts and the Commission ordered the employment of an engineering firm for the purpose of making a study thereof. Meanwhile, in 1970, Terminal made emergency repairs to the Oak Street viaduct and, at its request, that viaduct was included in the P.S.C. proceedings. Terminal filed a motion requesting the P.S.C. to allocate costs between it and the City.[2] Before ruling thereon, the Commission ordered Terminal and City to present their agreement on the repairs needed on the various viaducts and allocation of those costs. No agreement was made, the City taking the position that under the 1909 contract Terminal was contractually obligated to pay all of the costs and that the validity of that contract had been established in litigation between the parties in the second Oak Street case.

On March 22, 1972, the P.S.C. issued its report and order in this proceeding. Included therein was this finding:

"This Commission has jurisdiction of this cause under Section 389.640, RSMo 1969, V.A.M.S., to determine the safety of the above mentioned viaducts carrying city streets over railroad tracks, and to order repairs and reconstruction thereof if such are needed, and to allocate the cost thereof."[3]

2. Apparently, Terminal in the intervening years had acquiesced in the 1909 contract as construed in the second Oak Street case. City's brief so states and Terminal has not contended otherwise. As a matter of fact, Terminal during this period successfully sought recovery from Kansas City Transit of part of its cost of maintenance of some of the viaducts. Kansas City Terminal Ry. v. Kansas City Transit, Inc., 359 S.W.2d 698 (Mo. banc 1962).

3. Sec. 389.640 RSMo 1969 (originally § 50 of the Public Service Commission Act, Laws of Mo., 1913, p. 589), referred to in the P.S.C. order, provides that crossings of railroads, roads, streets and street railroads shall not be constructed without permission of the P.S.C. which shall have exclusive power to determine and prescribe "the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, use and protection" of such crossings, whether at grade or otherwise.

In addition, the P.S.C. order stated:

"City contends that the cost of repairs and reconstruction should be allocated in accordance with the provisions of the Franchise Ordinances of 1909 and 1911, which City asserts are contracts between it and Terminal. Assuming the ordinances are such contracts, they were not entered into after October 13, 1963, and only contracts entered into after that date are binding on this Commission under the terms of 389.640. The Commission is, therefore, obligated to apportion costs in accordance with the factors and standards set out in that statute."

Having concluded that under amended § 389.640 [4] the 1909 contract was not applicable and was not to be applied, the P.S.C. then proceeded to apportion to the City 90 per cent of the cost of the viaduct repairs and engineering with the remaining 10 per cent to be paid by Terminal. The entire cost of reconstruction of the viaducts at Prospect and Main was allocated to the City on the basis that this work was not of any benefit to Terminal.

The City filed application for review of the foregoing order in the Circuit Court of Cole County. That court affirmed the order of the P.S.C. and City appealed.

The City, in seeking reversal of the order allocating costs, relies primarily on the decision of this court in the second Oak Street case. It points out that Terminal and City (the same parties as those herein) there litigated the same question as now raised; namely, did the enactment of the Public Service Commission Act vesting authority in the P.S.C. to allocate costs of railroad crossings necessarily abrogate and supercede the obligation of Terminal under the 1909 contract to bear all of such costs? City insists that since this court in the second Oak Street case held such contract to be valid and that its provisions as to payment by Terminal for such installations did not interfere with the exercise of the state's police power and that such provisions were not abrogated by the enactment of the Public Service Commission Act, the issue has been settled.

■ If that decision stands, it necessarily is decisive of the issue raised by City's appeal unless, as the P.S.C. and the circuit court held, the amendment of § 389.640 in 1963 has altered the situation. The order of the P.S.C. is based on the premise that it did, and that under the terms of the 1963 amendment only contracts dated after October 13, 1963, may govern how costs may be apportioned. We reject that interpretation, it being our conclusion that the 1963 amendment does not affect the validity or applicability of the 1909 contract. We do not construe the language in the proviso added by the amendment as saying or implying that the P.S.C. shall ignore a con-

4. In 1963, § 389.640(2) was amended (Laws of Mo., 1963, p. 501) and the following proviso was added:
" * * * provided, however, that any agreement entered into after October 13, 1963, between any such corporation and the state, county, municipality or other public authority in interest, as to the apportionment of any cost mentioned in this section, shall be final and binding upon the filing with the commission of an executed copy of such agreement. If such parties are unable to agree upon the apportionment of said cost, the commission shall, except as to projects of the state highway commission, apportion the cost among the parties according to the benefits accruing to each. In determining such benefits, the commission shall consider all relevant factors including volume, speed and type of vehicular traffic; volume, speed and type of train traffic; savings, if any, which will inure to either party as the result of the project; and advantages to the public and to such corporation resulting from the elimination of delays and the reduction of hazard at the crossing. Any portion of the cost of any such project in excess of such benefits shall be apportioned to and assessed against the corporation, county, municipality, or other public authority desiring to make, or proposing, such installation, alteration, abolishment, or separation."

tract dated before October 13, 1963. It does not address itself to the question of prior contracts. It deals only with what occurs after its effective date (October 13, 1963) and simply says that if thereafter the railroad and public agency agree on apportionment of costs, the P.S.C. shall abide thereby. It says nothing that would justify a conclusion that the legislature intended by the amendment to nullify an earlier contract, particularly one previously held by this court to be valid and binding on the parties thereto. Furthermore, if the second Oak Street case correctly concluded that constitutional limitations against impairment of the obligation of contracts precluded impairment by the 1913 Public Service Commission Act of Terminal's obligation as to costs under the 1909 contract, it seems obvious that such limitations likewise would preclude impairment or abrogation thereof by the 1963 legislative amendment. For both of these reasons we hold that the P.S.C. and the circuit court were in error in holding that the 1963 amendment obligated the P.S.C. to ignore the 1909 contract and to apportion the costs on the basis of benefits.

Terminal asserts that even if the 1963 amendment did not have the effect of abrogating the 1909 contract still the court should affirm because the second Oak Street case on which the City relies was wrongly decided and should be overruled. This contention is based on the premise that § 389.640, in authorizing apportionment of costs as well as vesting in the P.S.C. the exclusive right to determine when, where, and how crossings are to be constructed, merely prescribes an appropriate exercise of the police power for the purpose of protecting the public safety.

■ There can be no doubt that protecting the public at intersections of railroads and streets or roads is a proper exercise of the police power. State ex rel. Missouri, K. & T. Ry. v. Public Service Commission, 271 Mo. 270, 197 S.W. 56 (banc 1917); State ex rel. Alton R.R. v. Public Service Commission, 334 Mo. 995, 70 S.W.2d 61 (1934). Pursuant to that power the legislature had the right to confer on the P.S.C. the exclusive right to determine whether to permit such intersections and, if authorized, to specify where, when and in what manner the intersection should be constructed.

■ There also is no question but that abrogation of a contract or rights thereunder as a result of proper exercise of the police power does not violate state or federal provisions against impairment of contracts. This is because the police power may not be hindered or frustrated by contracts between individuals or companies or governmental subdivisions. If an existing contract should have the effect of interfering therewith, it must necessarily give way to an appropriate exercise of the police power. State ex rel. Kansas City Terminal Ry. v. Public Service Commission, 308 Mo. 359, 272 S.W. 957 (1925); State ex rel. Wabash Ry. v. Public Service Commission, 306 Mo. 149, 267 S.W. 102 (1924), reversed on other grounds, 273 U.S. 126, 47 S.Ct. 311, 71 L.Ed. 575, but reinstated, 295 S.W. 86 (1927); American Tobacco Co. v. Missouri Pac. Ry., 247 Mo. 374, 157 S.W. 502 (banc 1912). This fact was recognized in the first Oak Street case when the court said, 272 S.W. at 962:

"* * * A railroad and a municipality cannot, by agreement, determine the manner, including the particular point, of the crossing of the railroad by a street, because of the paramount interest of the public in the question of safety involved."

City does not contend otherwise on this appeal.

Hence, the real issue in this appeal is whether, as Terminal contends, apportionment of the cost of the crossing by the P.S.C. was so inseparably a part of the Commission's action under the police power that its exercise necessarily had the effect of abrogating the existing 1909 contract

between the parties wherein they had agreed that Terminal would pay the cost of such projects. In discussing this question, Terminal's brief assumes the inevitability of an affirmative answer to this question. It does not in any manner demonstrate that if the P.S.C. does not allocate costs of the viaducts, the protection of the public safety by means of the police power will be frustrated or even hindered. Cases on which Terminal relies also make such an assumption. For example, Terminal cites two Illinois cases in support of its contention that the second Oak Street case was wrongly decided. The first is City of Chicago v. Illinois Commerce Commission, 356 Ill. 501, 190 N.E. 896 (1934). Examination of that opinion discloses that appellant city argued therein that provisions in the contract between it and the railroad requiring the latter to defray the cost of the improvement did not involve the public safety but pertained only to private financial arrangements between the parties. For that reason, the city contended, said financial arrangements did not come within the scope of the subsequent exercise of the state's police power and were not affected thereby. What did the court's opinion say in response thereto? Simply that "contracts of the character of the ordinance under review are subject to modification by subsequent statutes enacted in the bona fide exercise of the police power to promote the public health, morals, or safety, or the general welfare, and do not, by reason of the contract clause of the Federal or State Constitution (Const. U.S. art. 1, § 10, subd. 1; Const. Ill. art. 2, § 14), enjoy any immunity from such legislation." 190 N.E. at 900. The opinion simply stated the unsupported conclusion that apportionment of the costs was part of the police power and its exercise superceded the contract allocating those expenses.

Subsequently, the question arose again in City of Chicago v. Chicago & Nw. Ry., 4 Ill.2d 307, 122 N.E.2d 553 (1954), which is the second of the Illinois cases on which

Terminal relies. The city in that case argued that the provision in the contract between it and the railroad whereby the latter would pay the entire cost of reconstruction did not in any way limit the police powers of the Commerce Commission and was simply a voluntary contractual provision entered into for a valid consideration. It argued that the primary concern of the Commerce Commission was to determine whether the reconstruction was sufficient to preserve and promote public safety and to require the work to be done, not with who paid therefor. The court in its opinion concluded that it would not depart from the principles announced in the earlier case of City of Chicago v. Illinois Commerce Commission, *supra*, stating, 122 N.E.2d at 558:

"* * * We conclude, therefore, as we did there, that the apportionment of the cost of reconstruction of the viaduct over the grade crossing in question is an inseparable element of the police power which is vested exclusively in the Commerce Commission, and that it may not be abrogated by the contract the city seeks to enforce."

Obviously, what the court said in the two Illinois cases provided no analysis of whether achievement of the objective of the exercise of the police power was affected in any way by permitting the cost to be allocated between the parties pursuant to their preexisting contract rather than on a basis ordered by the Commission. It did not consider whether the health or safety of the public would be protected just as much if the costs were paid according to the contract as according to the Commission's directive.

We find that other cases cited by Terminal do not demonstrate that allocation of the cost of improvements directed is so inseparably a part of the police power as to require impairment of contractual obligations. Furthermore, they do not deal with comparable situations. For example, see State ex rel. Chicago, B. & Q. R.R. v. Public

Service Commission, 334 S.W.2d 54 (Mo. 1960); Wabash R.R. v. City of Wellston, 276 S.W.2d 208 (Mo.1955); State ex rel. St. Paul & K. C. Short Line R.R. v. Public Service Commission, 338 Mo. 724, 92 S.W.2d 126 (1936); State ex rel. Alton R.R. v. Public Service Commission, 334 Mo. 995, 70 S.W.2d 57 (1934); State ex rel. City of Kirkwood v. Public Service Commission, 330 Mo. 507, 50 S.W.2d 114 (1932). Other cases cited deal with situations wherein the court held that fixing rates charged and specifying services to be rendered by public utility companies is an exercise of the police power and that contracts which undertake to fix or limit such rates or services impinge on the police power and are invalid. Typical of this group of cases are State ex rel. Kansas City Public Service Co. v. Latshaw, 325 Mo. 909, 30 S.W.2d 105 (banc 1930); City of Cape Girardeau v. St. Louis-San Francisco Ry., 305 Mo. 590, 267 S.W. 601 (banc 1924); and State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 201, 204 S.W. 497 (1918). This group of cases cited by respondents is not pertinent because they deal with situations wherein the contract prohibits the very thing which the police power seeks to achieve, not, as here, with the incidental question of who pays for what is being done to protect the public health or safety. We conclude that none of the cases cited by Terminal establish that the second Oak Street case was wrongly decided or that it should be overruled.

■ We have decided that when a state or city properly directs that something be done in order to protect the public health or safety, it does not necessarily or universally follow that allocation of the costs thereof is such an inseparable part of that exercise of the police power that it automatically overrides and abrogates agreements of the parties as to how such expenses are to be borne. A hypothetical example will demonstrate why this is true. Suppose a city passes an ordinance which recites that the existence of old-time outhouses poses a threat to the health of the community and that they must be eliminated. The ordinance provides that by a specified date all outhouses must be removed and that they shall be replaced by inside toilets which owners of property are obligated to install and pay for. Clearly, under decided cases, this would be a valid exercise of the city's police power. City of St. Louis v. Hoevel Real Estate & Building Co., 59 S.W.2d 617 (Mo.1933); City of St. Louis v. Nash, 260 S.W. 985 (Mo.1924). However, suppose that shortly prior to passage of that ordinance a landowner and his tenant entered into a contract whereby the owner agreed to do various things desired by the tenant including addition of another bedroom, installation of an inside toilet and paving of a driveway. The parties entered into an agreement which established a new lease period and specified the amount of rent to be paid. As a part of that agreement, the tenant agreed to pay the cost of installing the inside toilet. Under such circumstances, would the passage of the ordinance imposing a duty on the owner to install and pay for the inside toilet abrogate the prior contractual arrangement between the owner and the tenant whereby the tenant had agreed to assume that cost? Clearly not. The objective of this exercise of the police power is to protect the public health and safety. This would be achieved by installation of the inside toilet and the removal of the old outhouse, thereby eliminating discharge of waste materials which might affect water supplies or spread disease. It would be completely immaterial to attainment of that objective whether the cost of the new inside toilet ultimately is borne by the owner or by the tenant. The question of who pays does not affect one iota the protection of the health of the public achieved by reason of the elimination of the old outhouses and construction of the new toilet. That being true, apportionment or assignment by the city of the cost of the improvement would not be such an inseparable part of the police power as to require

abrogation of the existing contract between the owner and his tenant. Recognizing and enforcing the contract allocating costs would not hinder or frustrate the city's police power.

There is an analogy between that hypothetical example and the facts of the case at bar. It is clear that the objective sought by the P.S.C. was to protect the safety of the traveling public by making the viaducts sufficiently strong and safe, not to specify who should pay therefor.[5] The degree of that safety is not affected by the allocation of the costs between the parties. The public will be just as safe if Terminal pays the costs of the improvements and repairs pursuant to its contractual obligations under the 1909 contract as it will be if 100 per cent of the cost of construction and 90 per cent of the cost of repairs is borne by the City as directed by the order of the Commission.

■ It is the function of the courts to determine whether a statute purporting to constitute an exercise of the police power has a real and substantial relationship to the protection of the public health, safety, morals or welfare and whether it unjustifiably invades rights secured by the Constitution. This long recognized principle is well stated in Mugler v. Kansas, 123 U.S. 623, 661, 8 S.Ct. 273, 297, 31 L.Ed. 205 (1887). In that case the court, in discussing the police power, its exercise and its extent, stated:

" * * * Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, Sinking Fund Cases, 99 U.S. 700, 718 [25 L.Ed. 496], the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176 [5 U.S. 137, 2 L.Ed. 60], 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor

5. The dissenting opinion of Judge Seiler contends that the interest of the public in this case was not limited to the safety of the viaducts. Rather, he says, it was interested also in the financial condition and stability of Terminal and its ability to maintain service and that requiring Terminal to comply with its contract might cause its equipment to become unsafe and its service to deteriorate. In making this assertion and in seeking to justify allocation of costs herein on that basis, the dissent takes a position not supported by the record on appeal or contended for by Terminal or by the Commis- sion. No contention whatsoever was made in this case by either party that allocation of costs by the Commission was for the purpose of protecting the financial stability of the railroad or the rates it would charge or the services it would render. In fact, during oral argument counsel arguing for respondents expressly stated in response to a question from the bench that the Commission's allocation of costs was based solely on evidence as to vehicular traffic count over the viaduct and trains passing on the tracks below and had no relationship to the economic situation of the railroad.

are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

The above rule is followed in Missouri. In State v. Layton, 160 Mo. 474, 61 S.W. 171, 174 (1901), the court quoted with approval from Mugler v. Kansas including much of the above quotation. See also 16 Am.Jur.2d Constituutional Law §§ 281, 282, 283; 16 C.J.S. Constitutional Law § 198.

The conclusion we reach is in harmony with our decision in State ex rel. Joplin & Pittsburg Ry. v. Public Service Commission, 289 Mo. 452, 233 S.W. 388 (banc 1921). In that case, the railroad company had a 1910 mortgage contract right to issue bonds on subsequent property additions. Sec. 57 of the P.S.C. Act prohibited issuance of bonds for additions made more than five years prior to application to the Commission for leave to issue bonds, and when the railroad sought authority from the Commission to issue bonds, it declined to approve on the basis that it was prohibited by § 57 of the Act from authorizing issuance. This court, in a proceeding in mandamus, directed the Commission to grant authority to issue the bonds, holding that *although the state under its police power had authority to regulate and prohibit issuance of bonds upon*

*property of utility companies, it did not possess such right to the extent of impairing existing contract rights when it did not appear that the public good would be served by withholding from the company the authority to issue bonds in accordance with its contractual rights.*

By analogy the state, in this case, acting through the Commission, had the right to direct repairs to and reconstruction of viaducts for the protection of the safety of the public but it did not have authority to abrogate the contract between City and Terminal with reference to allocation of the costs thereof when it was not shown that the public good would be served by taking away the City's contractual right to have Terminal pay those costs or that enforcing those rights would frustrate or hinder the exercise of the state's police power.

This view is supported also by Missouri, K. & T. Ry. v. Oklahoma, 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957 (1926), which was discussed and relied upon in the second Oak Street case.[6] In *M. K. & T.*, the city entered into a contract with the railroad whereby the latter granted the city a right-of-way for a street under its tracks and the city agreed to construct and pay for the street. Thereafter, the city obtained an order from the state corporation commission directing the railroad to construct an underpass and pay half the cost thereof. The Supreme Court held that the contract between the city and the railroad did not constitute a restraint on the police power, that it was a valid contract supported by adequate consideration and that it was within the protection of the constitutional provision forbidding impairment of the obligation of contracts by the state. Terminal

**6.** In urging that these two cases should not be followed, the dissent of Judge Bardgett relies heavily on the cases of Northern Pacific R.R. v. Minnesota ex rel. Duluth, 208 U.S. 583, 28 S.Ct. 341, 52 L.Ed. 630 (1908), and State ex rel. Wabash Ry. v. Public Service Comm'n, 306 Mo. 149, 267 S.W. 102 (Mo.1924). However, it should be noted that *M. K. & T.* is a later decision by the U.S. Supreme Court than *Northern Pacific* and second Oak Street is a later decision by this court than the Wabash case.

seeks to distinguish *M. K. & T.* from the case at bar but they are analogous.[7]

■ We hold that when the state appropriately directs that work be done in order to protect the public health or safety, the police power of the state includes the right to direct payment for the work ordered to the extent necessary to the achievement of the objectives for which the police power is being exercised, even if the result is to infringe on existing contractual rights, but that beyond that necessity, allocation of such costs is not an inseparable part of the police power. A determination that denial of the right of the state or city or its agency to allocate costs will frustrate or hinder enforcement of the police power and achievement of its objective is necessary as a condition to abrogating existing contractual rights.

■ In the instant case, in the absence of an agreement between the parties with respect to allocation of the costs, it would have been proper under § 389.640 for the Commission not only to specify the work to be done but also how the cost thereof should be borne. However, since the parties previously had entered into a valid and binding contract whereby they spelled out

how the costs of such improvements should be borne and since there has been no showing that enforcing those rights will frustrate or hinder the state's police power or the achievement of its objective, the state's police power should not be held to abrogate Terminal's obligation to pay for the improvements involved herein under said prior contractual arrangement.[8]

■ The rule we adopt recognizes that the police power is essential to the achievement of such objectives as protecting the health and safety of the public and that it is as broad as need be to achieve those objectives. At the same time, it recognizes that the police power is not so powerful that it impairs the obligations of contracts where such impairment is not necessary to achievement of the objective for which the power is being exercised. Such interpretation is in harmony with the definition of the state's police power adopted by this court in Marshall v. Kansas City, 355 S.W.2d 877, 883 (Mo. banc 1962):

"State ex rel. Carpenter v. City of St. Louis, 318 Mo. 870, 2 S.W.2d 713, 722[13], has adopted this definition of power as it now appears in 16 C.J.S. Constitutional Law § 174, p. 889: 'Police power is the exercise of the sovereign right of a

7. In *M. K. & T.* the city received a right-of-way from the railroad for which it undertook certain obligations including an agreement to construct and pay for the street. In this case Terminal received rights-of-way and a 200 year franchise from the city for which it assumed obligations, including the agreement to pay for constructing and repairing viaducts. In both cases the agreement between the railroad and the city was supported by substantial consideration. In both cases there was no showing that the agreement allocating costs constituted a restraint on the exercise of the police power or frustrated in any way the achievement of the objective.

The fact that the contract has a considerable number of years to run is not decisive. During that time Terminal continues to enjoy the franchise and right-of-way which it received in return for its agreement to pay the costs of viaducts. Under the rule announced herein, if a case arises in the future

wherein an issue is raised as to whether the contract allocating costs of repairs or reconstruction does frustrate or hinder the state's exercise of its police power, the court can resolve that issue on the basis of the evidence presented in that case.

8. Actually, the amendment to § 389.640(2) adopted in 1963 confirms this conclusion in that it impliedly recognizes that allocation of the costs of the intersection improvements by the P.S.C. is not a necessary and inseparable part of the act of directing what work is to be done. It provides that if, in an agreement dated after October 13, 1963, the railroad and city (or other governmental unit) agree upon allocation of the cost, the P.S.C. is bound thereby and may not apportion the costs otherwise. Only in the absence of such agreement is the Commission to allocate the costs. If it were an inseparable part of the police power, this arrangement would be inappropriate.

government to promote order, safety, health, morals, and the general welfare of society, within constitutional limits.' The police power is an essential attribute of government without which constitutional guaranties of personal and property rights would be ineffective and meaningless. In their very nature, neither the police power nor constitutional limitations can be absolute; they are necessarily relative and dependent in the complexities of modern life. 5 McQuillin, Municipal Corporations, 3d Ed., § 19.22, p. 531; Ex parte Smith, 231 Mo. 111, 132 S.W. 607, 609[3]."

Accordingly, we reverse the judgment of the circuit court and remand with directions that the case be remanded to the Public Service Commission for an order consistent with the views herein expressed. In so directing we are not, as suggested by Terminal, ordering that the Commission interpret and enforce the 1909 contract. That has been done by this court in the second Oak Street case and that decision is reaffirmed herein. We merely direct that the Commission recognize and abide by that judicial determination of how the costs of repairs and reconstruction are to be borne under the 1909 contract.

DONNELLY, C. J., and MORGAN, HOLMAN and HENLEY, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed and concurs in separate dissenting opinion of BARDGETT, J.

BARDGETT, Judge (dissenting).

I respectfully dissent. The basic issue in this case is the extent of power and authority of the Public Service Commission (hereinafter P.S.C.). Put in a more limited way and applicable to this case, the question is whether the adoption of the P.S.C. Act, now § 389.640, RSMo 1969,

(hereinafter the Act), by the State of Missouri rendered contracts between certain types of parties, to wit: railroads, which are subject to the jurisdiction of the P.S.C., and municipalities, which prior to the adoption of the Act exercised their police power with respect to railroads by contracts with or ordinances affecting railroads, unenforceable to the extent that such contracts or ordinances concerned the subject matter over which the P.S.C. was given jurisdiction.

Whether the municipality exercised its police power by contract or ordinance should not be of any great concern. This is so because the municipality, prior to the adoption of the Act in 1913, had the power—police power—to do it by ordinance (law).

The principal opinion undertakes to decide whether, in this case, the allocation of costs of improvements is so inseparably a part of the police power so as to require impairment of contractual obligations.

I do not believe that it is for this court to decide whether to give effect to the contractual apportionment of costs by deciding on a case-by-case basis if the apportionment of costs is essential to the attainment of the improvement. It seems to me that by the P.S.C. Act the state has preempted the field and declared as a matter of law and public policy that the P.S.C., and no one else, has the authority to allocate costs.

The language of the Act—"The commission shall have the *exclusive* power to determine and prescribe the manner . . . and the terms . . . apportionment of expenses . . ." (emphasis mine)— means that it is not left to the courts to determine on a case-by-case basis whether the apportionment of costs was necessary to obtaining the improvement. In other words, I do not believe the continued validity or right of enforcement of the contractual provisions depends upon what this court thinks concerning the relationship between

obtaining the improvement vis-a-vis the apportionment of costs. The legislature made that decision in 1913 when it adopted the P.S.C. Act and opted in favor of placing the *exclusive* authority in the P.S.C. In so doing, the state took that part of the police power to itself and ousted municipalities, railroads, and all other entities from exercising it, whether by ordinance or contract.

It would seem that, under the principal opinion, if in a year or so the P.S.C. orders an improvement to be made with respect to one of the viaducts crossing Terminal's tracks, which street or viaduct was referred to in the 1909 ordinance of Kansas City, then a court will again decide if the allocation of costs to obtain that improvement was inseparably necessary to the objective sought, so that if the improvement cannot be obtained except by allocating some of the cost to the railroad then the allocation will be valid. If the court decides that the improvement can be accomplished by the enforcement of the 1909 ordinance—all costs paid by the city, then the court will again enforce the contract.

I do not believe that is appropriate to determine the question of whether the P.S.C. unconstitutionally impaired the rights under existing contracts on the basis of whether or not the improvement can be obtained without there being an allocation of costs different from the 1909 ordinance franchise provisions.

The 1913 P.S.C. Act does not make the commission's power to allocate costs dependent upon any such considerations. That Act simply gives the P.S.C. *exclusive* power to allocate costs. Which controls— the 1909 franchise ordinance or the P.S.C. Act?

In State ex rel. M. K. T. Ry. Co. and Wabash Ry. Co. v. Public Service Commission, 197 S.W. 56 (Mo. banc 1917), the Wabash contended that by virtue of a contract entered into between it and the city of Moberly in 1887 the city had the obligation to pay one-half of the costs of a subway under its tracks. The P.S.C. ordered the improvement and apportioned the costs as follows: Wabash Railway, $18,246; M. K. T. Railway, $14,749; city of Moberly, $11,-695.

This court said, loc. cit. 59–60: "Assuming, but without deciding, that the above-mentioned contract was in fact duly executed as the law requires of contracts executed by a municipality, yet the contract cannot avail the appellant [Wabash] in this proceeding, for the reason that such a contract is void as against public policy, in that, if held valid, it would amount to a limitation on the exercise by the state of its police power. This exact point was passed upon by the Supreme Court of the United States in the case of Northern Pacific Railway v. Duluth, 208 U.S. 583, 28 S.Ct. 341, 52 L.Ed. 630. In that case a contract was entered into between the railroad company and the city of Duluth which provided for the construction of a viaduct at a point where one of the city's streets crossed the railroad. The initial cost was paid, $50,000 by the railroad and $23,000 by the city. The contract provided that the city, for a period of 15 years, should maintain the part of the bridge over the railroad's right of way, and that the city should perpetually maintain the approaches. Later the viaduct and the approaches became dangerous for public use, and the city under the exercise of a delegated power from the state undertook to require the railroad company at its own expense to make the needed improvement. The city by mandamus proceeding undertook to enforce its order. The railroad company pleaded the contract as a defense. The trial court granted the city the relief prayed. Upon appeal the state Supreme Court affirmed the judgment. 98 Minn. 429, 108 N.W. 269. Upon error to the Supreme Court of the United States the judgment was affirmed, the court saying:

" 'The result of these cases (citing) is to establish the doctrine of this court to be

that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution. In this case the Supreme Court of Minnesota has held that the charter of the company, as well as the common law, required the railroad, as to existing and future streets, to maintain them in safety, and to hold its charter rights subject to the exercise of the legislative power in this behalf, and that any contract which undertook to limit the exercise of this right was without consideration, against public policy, and void. This doctrine is entirely consistent with the principles decided in the cases referred to in this court. But it is alleged that at the time this contract was made with the railroad company it was at least doubtful as to what the rights of the parties were, and that the contract was a legitimate compromise between the parties, which ought to be carried out. But the exercise of the police power cannot be limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the state or the municipality to abrogate this power so necessary to the public safety.' "

In State ex rel. Wabash Ry. Co. v. Public Service Commission, 267 S.W. 102 (Mo. 1924), the court had before it an order of the P.S.C. abolishing a grade crossing of the Wabash track and Delmar boulevard in St. Louis. The order required the construction of a viaduct over the Wabash tracks and allocated the costs 40% against the city and 60% against Wabash. Wabash contended that the order impaired its rights under authority of an act of the Missouri legislature, approved March 25, 1874, by which the railroad right of way and the grade thereof was established through Forest Park as it still existed in 1924 and that it was provid-

ed that the contract between Wabash and the Forest Park commissioners could not be changed without the consent of all parties.

The court held at 108: "It cannot be longer doubted that a railroad holds its right and title to cross or occupy the public highways upon condition that, when such occupancy or use renders them dangerous to human life, the state has the plenary constitutional power to require the railroads to separate the grades and to go under or over the highways, as the state may direct, and impose the entire cost of so doing upon the railroad. Erie R.R. Co. v. Board of Public Utilities, 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322; State v. Public Service Commission, 272 Mo. 650, 199 S.W. 999."

The court then held: "Nor does the fact that the grade and location of the Wabash tracks through Forest Park were made pursuant to contract between the park commissioners and the railroad, or that the Wabash has leased its tracks to the Rock Island, prevent the state from eliminating dangerous grade crossings *at the expense of the railroads.* The police power of the state to so require cannot be surrendered by contract or compromise. *All such contracts are void.* Northern Pacific Railway v. [State of Minnesota ex rel. City of] Duluth, 208 U.S. 583, 28 S.Ct. 341, 52 L.Ed. 630; State ex rel. [Missouri, K. & T. R. Co.] v. Public Service Commission, 271 Mo. [270] 286, 197 S.W. 56; American Tobacco Co. v. [Missouri Pacific R. Co. and] St. Louis, 247 Mo. [374] 433, 157 S.W. 502." (emphasis mine.) 267 S.W. 108.

Kansas City v. Kansas City Terminal Ry. Co., 25 S.W.2d 1055 (Mo. banc 1929), known as the Second Oak Street case, upheld the validity of the same contract that is the subject matter of the instant case. The opinion in the Second Oak Street case sought to distinguish the Moberly case with reference to allocation of costs under a prior contract as opposed to an allocation made by the P.S.C. by saying at 1066: "Contracts with reference to the construction of crossings have been held void primarily on the

ground that they were without consideration. Such was the Moberly Case. State ex rel. v. Public Service Commission, 271 Mo. 270, 197 S.W. 56." But this court in the Moberly case did not declare the contract void for lack of consideration. The court explicitly declared the contract void "*as against public policy*, in that, if held valid, it would amount to a limitation on the exercise by the state of its police power." (emphasis mine.) 197 S.W. at 60.

The Second Oak Street case then went on to say that the Moberly case followed Northern Pacific Railroad Co. v. Minnesota ex rel. Duluth, 208 U.S. 583, 28 S.Ct. 341, 346, 52 L.Ed. 630, and quoted the first portion of the second to last paragraph in that case. The entire paragraph has been quoted supra in this dissent. It is seen that the United States Supreme Court was first setting forth the holding of the Minnesota Supreme Court from where the case came to the U.S. Supreme Court by saying that the Minnesota Supreme Court said that "*any* contract which undertook to limit the exercise of this right was without consideration, against public policy, and void." (emphasis mine.) The U.S. Supreme Court went on to say that the Minnesota ruling was consistent with the principles in cases decided by the U.S. Supreme Court and then recognized the railroad's contention that the contract between it and the city of Duluth ought to be given effect because it was a compromise of doubtful rights. That statement was made to support the railroad's contention that there was contractual consideration for the agreement. The U.S. Supreme Court then gave its own decision on the matter and in it recognized that there could be and would be agreements that had been entered into between railroads and municipalities which, *if the parties had the right to contract on the subject matters*, would be valid, and struck down all such contracts regardless of the existence of contractual considerations. The language is all pervasive. The court went

on to say, 208 U.S. 583, 28 S.Ct. 346: "But the exercise of the police power cannot be limited by contract for reasons of public policy; nor can it be destroyed by compromise; and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the state or the municipality to abrogate this power so necessary to the public safety. Chicago, B. & Q. R. Co. v. Nebraska, 170 U.S. 57, 18 S.Ct. 513, 42 L.Ed. 948."

In 1936 division two of this court decided the case of State ex rel. St. Paul & K. C. Short Line R. Co. v. Public Service Commission of Missouri, 92 S.W.2d 126 (Mo.1936). That opinion claims to follow the Second Oak Street case, the Moberly case. M. K. & T. Ry. Co. v. Oklahoma, 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957 (1926), is referred to as being exact converse of St. Paul & K. C. Short Line. In the St. Paul & K. C. Short Line case, the railroad and Caldwell County agreed upon a plan of grade separation which was filed with and approved by the P.S.C. They also agreed that Caldwell County would pay $10,000 in yearly installments of $500 as its part of the cost and this agreement was recognized by the P.S.C. The railroad was to construct the viaduct and did so at a cost in excess of $23,000. Caldwell County refused to pay its agreed-upon share so the railroad filed a petition before the P.S.C. to apportion the cost. The commission dismissed the petition on the ground that the agreement between the railroad and Caldwell County controlled and therefore the commission lacked jurisdiction in the matter. The commission was affirmed by the Circuit Court of Cole County and the railroad appealed to this court. Division two of this court reversed the commission. In so doing, the court said, 92 S.W.2d 129:

"Frequently in the separation of grade crossings of our state highways and railroad tracks, the highway department and the railroad companies submit agreed plans for the separation, as well as the apportion-

ment of cost. If, upon an examination, the plans of separation meet with the approval of the Public Service Commission, the commission adopts the plans and enters an order to that effect. The commission should follow the same procedure with reference to the apportionment of the cost. The apportionment agreed upon should be examined, and if found satisfactory and equitable, the commission should enter an order in the same manner as with reference to the plans of separation. In other words, the apportionment of the cost should be by order of the commission. It has never been contended that in a case where a railroad company and the highway commission have agreed upon a plan of separation which had been submitted to the commission, that that involves the interpretation of a contract. It is conceded that such an agreement is not binding on the commission. Under the ruling made in the Moberly Case and in the Oak Street Viaduct Case, by the court en banc, agreements of the kind now before us stand on the same footing with agreements as to the plans of separation. Statute, section 5171, R.S.Mo. 1929 (Mo.St.Ann. § 5171, p. 6585), grants to the commission 'the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses,' etc., of all grade crossings and the separation thereof. The only limitation in this statute upon the power of the commission is that it is authorized to assess not more than one-half of the cost of a separation of a grade crossing, between a railroad company and a highway, against the highway department. In cases, therefore, as the one now before us and the Moberly Case, agreements between cities, counties, or the state, and the railroad companies, as to the apportionment of cost of separation of grades, are no more binding upon the commission than an agreement as to the plans of separation."

Thus it is seen that division two of this court held a contract for the apportionment of costs of a specific viaduct where the railroad had fully performed void and remanded the matter to the P.S.C. for apportionment of costs.

The holding in the St. Paul and K. C. Short Line case is compatible with the Moberly case and the Northern Pacific v. Duluth case, supra. It is incompatible with M. K. T. v. Oklahoma, supra, unless M. K. T. v. Oklahoma is distinguished on the same basis as set forth in Judge Blair's dissent in the Second Oak Street case, and as set forth in City of Chicago v. Chicago and North Western R. Co., 4 Ill.2d 307, 122 N.E.2d 553 (1954). The distinction set forth in both cases is that M. K. T. v. Oklahoma represented a situation where the contract ordinance was, in effect, an agreement or settlement between a city and the railroad in lieu of eminent domain proceedings as to a specific point on the railroad property where the city could make a crossing. In other words, it was the settlement of condemnation damages.

I believe the distinction made in Judge Blair's dissent in the Second Oak Street case and by the Illinois Supreme Court in City of Chicago v. C. & N. W. R. Co., supra, to be correct. In M. K. T. v. Oklahoma, supra, the Supreme Court of the United States in saying that the railroad would be deprived of its property without due process of law was, in my opinion, talking about the real property of the railroad which could only be taken by eminent domain proceedings in the absence of an agreement whereby the railroad granted a right of way to the city for the Comanche Street crossing.

In City of Chicago & C. & N. W. R. Co., supra, and its progenitor, City of Chicago v. Illinois Commerce Comm., etc., 356 Ill. 501, 190 N.E. 896 (1934), the Illinois Supreme Court struck down a contract and a Chicago ordinance by which the apportionment of costs as between Chicago and the railroad company was controlled on the grounds that the Illinois Public Utilities Act vested the exclusive authority to apportion the costs in the Illinois Commerce Commission.

The Missouri Act also vests exclusive authority in our P.S.C. to apportion the costs and should, in my opinion, be given effect and, as stated in Erie R. Co. v. Board of Public Utility Com'rs, 254 U.S. 394, 411, 41 S.Ct. 169, 171, 65 L.Ed. 322 (1921), "Contracts made by the road [railroad] are made subject to the possible exercise of the sovereign right."

It must be accepted, I think, that our P.S.C. Act did render unenforceable certain rights which under the laws relating to private contracts could not have been voided under the provisions of the United States and Missouri constitutions relating to impairment of contracts. But this is not unconstitutional where, as here, the police power constitutes a continuing obligation upon the state to oversee railroad operations vis-a-vis improvements necessary to the public. And this obligation, in my opinion, must be exercised as the need arises. It cannot be permitted to lie dormant for a period of 200 years, the term of the contract ordinance in the instant case, under a theory that the ordinance contract was an exercise of police power and not an abandonment of it.

The two Illinois cases cited supra held the power of the commission to apportion the expense of improvements was inseparable from the power to determine its necessity and manner of accomplishment. I agree with the Illinois Supreme Court's holdings and believe the Missouri Act requires the same interpretation. As stated supra, it is my opinion that the Missouri legislature made that decision when it enacted the Act in 1913.

I agree with the ruling in the principal opinion that the 1963 amendment to § 389.-640 which required the commission to accept any agreement entered into after the effective date of the amendment for allocation of crossing costs is not controlling in this case. That amendment does not, in my opinion, validate the type of ordinance contract involved in this case even if it were entered into after the amendment became effective. The entire context of the amendment shows that it is operative only where a specific improvement has been ordered by the P.S.C. and as to that particular improvement the parties have agreed upon a cost allocation. The constitutionality of that amendment, even in its limited scope, is not before the court in this case.

The P.S.C. order in this case allocated 90% of the cost of repairs of the viaduct to the city and 10% to the railroad. The costs of construction were allocated 100% to the city. The costs of the engineering study were allocated 90% to the city and 10% to the railroad, as were the expenditures by the railroad of $148,663.48 for the Oak Street viaduct repairs.

The only evidence presented to the commission was a traffic count made by the railroad which showed the number of motor vehicles using the viaduct and the number of trains (not railroad cars) passing under the viaduct. The city put on no testimony with respect to relative benefits, etc. Apparently this was because this court in the Second Oak Street case upheld the validity of the 1909 ordinance and the city relied upon that decision before the P.S.C. Regardless of that, the city should have come forward with evidence bearing upon cost allocation, and had there been substantial and competent evidence to support the allocation order entered, I would not favor a rehearing on that issue. As the record stands, however, the allocation that was made by the commission is not supported by competent and substantial evidence. It is simply unrealistic to base an allocation order involving projects of this size on a comparison of one automobile with one train, particularly when the train may consist of anywhere from one to 150 or more railroad cars. Other factors may also affect the commission's order allocating costs which may be presented to the commission on remand.

For the reasons stated in this dissent and those stated in the dissent of Seiler, J., I would overrule Kansas City v. Kansas City Terminal Ry. Co., 324 Mo. 882, 25 S.W.2d 1055, and hold that the exclusive authority to allocate costs mentioned in § 389.640 is in the Public Service Commission and that the 1909 ordinance involved in this case is void insofar as it undertakes to allocate costs of a crossing improvement over a 200-year period.

However, because, in my opinion, the allocation order with respect to the building of the improvement was not based upon substantial and competent evidence, I would reverse the order of the circuit court which affirmed the order of the commission and remand the matter to the commission for a full hearing on the cost allocation question.

For the foregoing reasons, I dissent.

SEILER, Judge (dissenting).

I respectfully dissent. This is required, in my opinion, because Sec. 389.640, subd. 22, RSMo 1969, provides that "The commission shall have the *exclusive* power to determine . . . apportionment of expenses . . ." [of such viaduct repairs and reconstruction between the railroad and city] (emphasis supplied). This being the case, the 1909 contract which provides otherwise must yield to this exercise of the police power of the state.

It is enlightening to refresh ourselves on the broad overall purpose of the Public Service Commission Act, which deals with the regulation of businesses which are monopolies, such as the railroad is in this instance. As was said in the first case to analyze the then new Public Utilities Act, State on Inf. Barker ex rel. Kansas City v. Kansas City Gas Company, 254 Mo. 515, 163 S.W. 854, 857–8 (banc 1914):

"That act is an elaborate law bottomed on the police power. It evidences a public policy hammered out on the anvil of public discussion. It apparently recognizes certain generally accepted economic principles and conditions, to wit: *That a public utility* (like gas, water, car service, etc.) *is in its nature a monopoly*; that competition is inadequate to protect the public, and, if it exists, is likely to become an economic waste; that state regulation takes the place of and stands for competition; that such regulation, to command respect from patron or utility owner, must be in the name of the overlord, the state, and to be effective, must possess the power of intelligent visitation and *the plenary supervision of every business feature to be finally (however invisible)* reflected in rates *and quality of service.* It recognizes that *every expenditure,* every dereliction, every share of stock, or bond, or note issued as surely is finally reflected in rates and *quality of service to the public,* as does the moisture which arises in the atmosphere finally descend in rain upon the just and unjust willy nilly" (emphasis supplied).

It cannot be said, in my opinion, that the only interest of the public here is in the safety of the viaducts. The public also has an interest in the quality of service provided by Kansas City Terminal Railroad Company. If Kansas City Terminal Railroad Company has to pay 100 per cent of the cost of repair and reconstruction of the viaducts over the next 134 years (this being the balance of time remaining in the 200 year contract), it could become such a burden that the railroad company would have no money left for any other purposes. Its quality of service might deteriorate. Its equipment might become unsafe. Other viaducts might fall into disrepair. It is because of these broad considerations that the legislature saw fit to give the Public Service Commission exclusive power to apportion repair and reconstruction costs such as are here involved. There had to be considered more than the immediate question of making the viaducts safe. There also

had to be considered the long range questions of how and to what extent the cost of repairs would affect the railroad's ability to conduct its operations as a railroad. What the 1909 contract does as ruled by the majority opinion is to make 100 per cent cost of reconstruction and repair of the viaducts a first priority on the assets of the railroad company. Whatever else may happen the railroad company must for the next 134 years pay 100 percent of the charges involved and this could prove disastrous to the balance of their operation. The majority opinion removes from the Commission the power to determine what is best for the public as of the time it is called upon to decide.

In the example put by Judge Finch about the city ordinance requiring elimination of outdoor toilets, while the force of the ordinance was directed against the landlord or owner and he would be the one who would be prosecuted if the outdoor toilet were not removed, it made no difference to the public health of the city who paid for the improvement, so long as the outdoor toilet was removed and replaced by an inside toilet.

But in our case, the statute makes no attempt to direct its force against one party or the other to fix the cost of repairs. Instead it leaves this to the exclusive determination of the Public Service Commission. This is because in the case of public utilities it does make a difference who pays and how much; regulation of a monopoly is involved and the cost of such repairs and reconstruction is one of the factors which affect the overall ability of the utility being regulated to perform its services to the public. Allocation of costs is important to the objective sought.

For our case to be parallel to the example put by Judge Finch, the statute would have to provide that the city (or the railroad) would pay all the costs of repairs and reconstruction on viaducts. It could then be said that the only interest of the state was to see that the viaducts were safe and the situation would be comparable to Judge Finch's example. But this is not what the statute provides and in my opinion we should not arrive at a result which is the exact opposite of what the statute prescribes. The mere statement of the position that the contract before us controls who pays for each and every viaduct or subway now existing or which the city might require the railroad to construct for the balance of the full two hundred year term of the contract demonstrates the invalidity of the contract as against the exercise of the police power of the state as set forth in Sec. 389.640, subd. 22.

I also concur in the views expressed by BARDGETT, J., in his dissenting opinion herein.